UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| INNOVATION VENTURES, L.L.C., | § | |
| | § | |
| d/b/a Living Essentials, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 4:08-CV-232 |
| v. | § | |
| | § | ECF |
| ULTIMATE LIFESTYLES, L.L.C., | § | |
| CUSTOM NUTRITION | § | |
| LABORATORIES, LLC, MIKE | § | |
| NORWOOD AND ALAN JONES, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' FIRST AMENDED COUNTERCLAIM

Defendants Ultimate Lifestyles, LLC, Custom Nutrition Laboratories, LLC, ("CNL"),

Mike Norwood and Alan Jones ("Jones") (collectively, Counter Plaintiffs") file their First

Amended Counterclaim against Innovation Ventures, LLC d/b/a/ Living Essentials, ("Living

Essentials") , as follows:

## I.  INTRODUCTION

1.      CNL is a formulator, designer, manufacturer and seller of dietary supplements.

Living Essentials contracted with CNL to purchase a dietary supplement formulated and

manufactured by CNL.  CNL manufactured and shipped the product to Living Essentials.  Living

Essentials markets the product under the product name "5 Hour Energy."  In order to free itself

from its obligations to CNL and profit from the illegal use of CNL's formula, Living Essentials

abruptly and wrongfully terminated its agreement with CNL.  Prior to its wrongful termination,

Living Essentials purposefully, and with malice, ran up a considerable receivable in hopes of

driving CNL out of business. Living Essentials is now using CNL's stolen trade secrets to have the product manufactured by other vendors.  Accordingly, the proprietary trade secrets which CNL created have now been disseminated to other individuals and third party competitors of CNL in an effort to deny CNL its rightful profits as the inventor of the original formula. Additionally, Counter Plaintiffs assert that Living Essentials has no trademark rights in the product name "5 Hour Energy," Living Essentials has monopolized or is attempting to monopolize the energy drink market and Living Essentials is operating a criminal enterprise. Counter Plaintiffs bring this counterclaim to recover their damages.

## II.  PARTIES

2.      Ultimate Lifestyles, LLC is a Texas limited liability company.

3.      CNL is a Texas limited liability company.

4.      Mike Norwood is an individual citizen of Texas.

5.      Alan Jones is an individual citizen of Texas.

6.      Living Essentials is a Michigan limited liability company with its principle place of business in Michigan.  Living Essentials is a citizen of Michigan and has already appeared herein and summons is therefore unnecessary.

## III.  JURISDICTION

7.      This Court has personal jurisdiction over Living Essentials as it is voluntarily before this Court as Plaintiff and because it does business within the State of Texas and is engaged in continuous and systematic business within the state of Texas, including the commission of the wrongful acts alleged in this Counterclaim. Further, a substantial part

of the events or omissions giving rise to these claims occurred in Texas.  Living Essentials is subject to the personal jurisdiction of this Court.

8.      This Court has jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§1331 and 1338(a), and supplemental and pendent jurisdiction under 28 U.S.C. § 1367, as CNL brings claims under the federal Copyright Act, 17 U.S.C. § 101 *et seq*., and the Lanham Act, 15 U.S.C. § 1051, *et seq*, the Sherman Act and the RICO Act. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 exclusive of interest, costs, and fees, and by virtue of the diversity of citizenship of the parties.

## IV.  FACTUAL BACKGROUND

### A.      <u>The Origin of the Relationship between CNL and Living Essentials.</u>

9.      CNL is a Texas limited liability company that designs, formulates, manufactures, packages and sells dietary supplements in Carrollton, Texas.  CNL manufactures "private label" nutritional supplements.  CNL sells its "private label" products, as finished goods, at wholesale to companies that further distribute such products via further wholesale distribution or direct to retail.

10.      CNL first came in contact with Living Essentials at the National Association of Convenience Stores show in Chicago, Illinois in November 2003.  It was at this show that Tom Morse ("Morse"), at the time Living Essentials' President, saw another product developed by CNL, a liquid nutritional supplement in a two ounce bottle sold under the product name "Shotsz".  In February 2004, Living Essentials contacted CNL and indicated an interest in marketing a product similar in concept to the "Shotsz" product Morse had seen in Chicago.

11.     Based on Living Essentials' request to purchase and distribute a product similar in concept to the "Shotsz" product, CNL developed another formula for use as a two ounce liquid nutritional supplement (the "CNL Formula").  The CNL Formula was developed entirely by CNL in CNL's facilities in Dallas, Texas.  CNL has expended millions of dollars, over the years, to create a fully staffed and equipped development laboratory and production facility.  The development of the CNL Formula was only possible as a result of this substantial investment in time and money to develop the infrastructure and know how necessary for such a project.  Accordingly, the costs for the development of the CNL Formula were borne entirely by CNL and necessarily include this substantial investment in infrastructure and personnel.  The flavoring ingredients and the amounts of significant parts of the active ingredients are not disclosed on the product label and they are proprietary trade secrets of CNL.  CNL is the owner of the CNL Formula which constitutes a CNL trade secret.

12.     On May 12, 2004, CNL and Living Essentials entered into a Confidentiality Agreement (the "Confidentiality Agreement").  The Confidentiality Agreement requires Living Essentials to maintain in confidence, and not use, any information disclosed by CNL during the relationship, including the CNL Formula.  Manoj Bhargava ("Bhargava"), Living Essentials' CEO, traveled to CNL's facilities in Dallas to execute the Confidentiality Agreement.  At a meeting that occurred in Dallas, Texas on May 12, 2004, Bhargava, as Living Essentials' CEO, represented to Jones, CNL's CEO, that CNL did not need to be concerned about Living Essentials' violating any confidentiality agreement between the parties because Living Essentials was a marketing company only, and that neither he nor Living Essentials would ever become

involved in manufacturing.  This representation was false when made and was intended to deceive and mislead CNL.

13.     Bhargava also represented to Jones and Gill during the May 12, 2004, meeting that he had dropped out of Princeton University and moved to India where he lived as a monk for the next twelve years.  Bhargava made this representation in order to persuade Living Essentials that he was an ethical and spiritual man and that he could be trusted.  CNL believed Bhargava's representations and Jones formed the opinion that Bhargava was a very spiritual man that could be trusted to act in an ethical and moral manner.  In fact, after dropping out of Princeton, Bhargava moved to New York and worked as a taxi cab driver.  Bhargava has never been a monk, in India or anywhere else.  Thereafter, Bhargava  was given access to CNL's manufacturing and research and development facilities.

14.     On June 9, 2004, Living Essentials issued its first purchase order for the product which, by that time, was referred to by Living Essentials as "Chaser 5 Hour Energy" (the "Product").[1]  The Product was, at all times, sold to Living Essentials pursuant to CNL's Standard Terms and Conditions which, *inter alia*, include a confidentiality clause prohibiting Living Essentials' from disclosing or using any information supplied by CNL, including the CNL Formula.

15.     During the course of the relationship with Living Essentials, CNL would receive purchase orders for the Product via email, fax or delivery from Michigan.  Production of the Product occurred solely at CNL's facilities in Texas.  Bottling of the Product occurred in CNL's facilities in Texas.  Labeling and packaging of the Product occurred in CNL's facilities in Texas.

---

[1] Later, the Product's name was shortened to "5 Hour Energy."

DEFENDANTS' FIRST AMENDED COUNTERCLAIM - Page 5

**B.     Living Essentials Misappropriates the CNL Formula.**

16.     Living Essentials did not originally possess the CNL Formula or the knowledge and technology associated with the CNL Formula.  However, Living Essentials represented to CNL that it required the CNL Formula for insurance purposes.  In this regard, on June 29, 2004, Bhargava sent an email to CNL in Dallas requesting that CNL provide him with the CNL Formula in order to provide it to Living Essentials' insurance company.  CNL did not respond. Thereafter, on July 12, 2004, the earlier email was forwarded again by Bhargava to CNL requesting the CNL Formula.

17.     The CNL Formula existed in a computer software database (the "Genesis Software")  used by Jones for the formulation of nutritional supplement products.  Only Jones had access to the Genesis Software, which resided only on his laptop computer and not on any network servers or data storage devices.  As a result of the request from Living Essentials, Jones caused the Genesis Software to print out a copy of the CNL Formula (the "Genesis Printout"). On July 13, 2004, CNL faxed the Genesis Printout to Living Essentials. Before faxing the Genesis Printout, Jamie Gill ("Gill") called Morse and informed him that the CNL Formula was the proprietary property of CNL and that CNL owned the CNL Formula. Gill further informed Morse that CNL did not disclose it formulations.  However, Gill stated that CNL would accommodate Living Essentials' request for the disclosure of the Formula, pursuant to the Confidentiality Agreement, for the sole purpose of Living Essentials obtaining product liability insurance related to the Product with the understanding that the CNL Formula and the Genesis Printout were the proprietary property of CNL, would remain confidential and would not otherwise be disclosed or used.  Morse, as Living Essentials' president, agreed.  Both the

facsimile cover sheet transmitting the Genesis Printout and the Genesis Printout itself were clearly stamped "CONFIDENTIAL." It was understood by Living Essentials' management that the Genesis Printout was to be treated as confidential and used only for the requested insurance purpose.  As is set forth below, Living Essentials did not seek to acquire the CNL Formula solely for the stated insurance reason.  Rather, Living Essentials intended to misappropriate the CNL Formula as evidenced by the almost immediate purported assignment of the CNL Formula to another company closely related to Living Essentials.

18.    If Living Essentials had any objection to CNL's position that it owned the CNL Formula and the CNL Formula was its proprietary intellectual property, Living Essentials was free to cancel the purchase order.  It did not cancel the purchase order or otherwise object to CNL's claims of ownership of the CNL Formula.  In reliance, in part, on Living Essentials' agreement that the CNL Formula would remain CNL's proprietary trade secret and that the Genesis Printout would not be used or disclosed, except to Living Essentials' insurance company, CNL began production and shipment of the first batch of the Product in August 2004.

19.    Thereafter, in 2005, Living Essentials requested further detailed information regarding the CNL Formula in order to gain approval to import the Product into Canada. Accordingly, and pursuant to the terms of the Confidentiality Agreement and the Standard Terms and Conditions under which the Product was sold, CNL provided detailed product specifications (the 'Product Specifications") about the CNL Formula to Living Essentials.  The Product Specifications were reduced to a tangible form, an electronic document, which was transmitted to Living Essentials via email.  Again, it was understood by Living Essentials' management that

the Product Specifications were to be treated as confidential and used only for the requested regulatory purpose.

**C.      Living Essentials Assigns the Intellectual Property Associated with 5 Hour Energy.**

20.     On or about June 14, 2004, Living Essentials applied for a federal trademark on the product name "5 Hour Energy."  Sometime prior to September 15, 2004, Living Essentials assigned, by written assignment, all the intellectual property associated with the Product, including purported ownership of the CNL Formula, trademark and trade dress rights, to another company, Bio Clinical Development, Inc. ("Bio Clinical").  Bio Clinical is controlled exclusively by Bhargava.  Bhargava set up Bio Clinical in order to facilitate Living Essentials' theft and misappropriations of CNL's trade secrets.  Thereafter, Bio Clinical entered into an "Intellectual Property & Trade Name Licensing Agreement" wherein Bio Clinical granted Living Essentials a non-exclusive license (the "Licensing Agreement") to use the intellectual property associated with the Product, including the CNL Formula, the product name "5 Hour Energy" and the trade dress associated with the Product.  Living Essentials has paid Bio Clinical royalties pursuant to the Licensing Agreement.

21.     Importantly, the Licensing Agreement provides no control over the quality or consistency of any products marketed by Living Essentials and precludes Living Essentials from bringing an action for infringement.  In fact, Living Essentials has failed to exercise consistent quality control over the Product such that it refused to recall Product which was distributed with apparently defective Sucrulose, a non-caloric sweetener, even though Living Essentials claims that the taste of the affected Product was terrible.  Additionally, Living Essentials distributed adulterated and/or misbranded versions of the Product with false label claims either alleging an

ingredient, vitamin C, was in the Product when, in fact, it was not, or failing to list an ingredient, citicoline, actually included in the Product.[2]

22.    Further, despite that Living Essentials had purportedly assigned the "5 Hour Energy" trademark to Bio Clinical, on July 19, 2005, Living Essentials filed an Amendment to Allege Use and submitted a sworn declaration that Living Essentials was then using the product name "5 Hour Energy" in connection with "homeopathic supplements, pharmaceutical preparations, nutritional supplements and dietary supplements that relieve or prevent fatigue."  In fact, neither Living Essentials nor Bio Clinical has never used the product name "5 Hour Energy" in connection with either "homeopathic supplements or pharmaceutical preparations." As a result of Living Essentials' fraudulent allegation of use, the USPTO registered the product name "5 Hour Energy" on the Supplemental Trademark Register with respect to "homeopathic supplements, pharmaceutical preparations, nutritional supplements and dietary supplements that relieve or prevent fatigue."

**D.    Living Essentials Misappropriates CNL's Manufacturing Processes.**

23.    By the summer of 2006, Living Essentials decided to sever its relationship with CNL.  This would require Living Essentials to obtain another source for the manufacturing of the Product.  However, Living Essentials knew that CNL would not consent to the disclosure of its confidential information to another manufacturer.  Accordingly, Living Essentials secretly entered into a relationship with another contract manufacturer.  Living Essentials, with the knowledge and consent of Bio Clinical, provided the manufacturer with the CNL Formula and

---

[2]The manufacturing of the adulterated Product was done, not by CNL, but by a separate manufacturer contracted by Living Essentials to manufacture the Product.

CNL's other proprietary information. In fact, Living Essentials provided the other manufacturer with an actual copy of the Genesis Printout which CNL had provided to Living Essentials. Living Essentials engaged in all such conduct on behalf of and with the consent and complicity of Bio Clinical.

24.     Still, neither Living Essentials, Bio Clinical, nor their new manufacturer, actually knew how to manufacture the Product, even with the CNL Formula. As a result, Scott Henderson ("Henderson"), Living Essentials new President, with Living Essentials' and Bio Clinical's full knowledge and consent, made a trip to CNL's facilities to observe CNL's confidential and proprietary manufacturing process (the "Manufacturing Processes"). Henderson affirmatively represented to Jones during his trip to Dallas that he was simply interested in understanding the Manufacturing Processes out of curiosity. During the trip, Henderson observed the details of CNL's Manufacturing Processes for two days. Henderson asked specific questions of CNL to determine how the Manufacturing Processes were performed. Henderson was gathering this information because Living Essentials' new manufacturer had no experience manufacturing nutritional supplements and did not understand how the Manufacturing Processes needed to be performed. Living Essentials' new manufacturer was actually a manufacturer of salad dressing and barbeque sauce and had never before manufactured a dietary supplement. Henderson did not disclose to CNL that he was gathering such information for purposes of supplying the information to another manufacturer. Living Essentials, with the full knowledge and consent of Bio Clinical, then passed this knowledge to its new manufacturer.

25.     Additionally, during the summer of 2006, Living Essentials induced CNL to move its facilities, at great expense to CNL, by representing that sales were soon to explode and

CNL would need to greatly increase its manufacturing capacity. CNL's current facilities were approximately 32,000 square feet and there was no physical room available to add a second liquid manufacturing line. Accordingly, CNL negotiated to lease a new 80,000 square foot facility. CNL also investigated the purchase of a new liquid manufacturing line. In approximately August 2006, CNL executed a ten year lease on the new facility. CNL also ordered a new liquid production line to be installed in the new facility. Bhargava and Henderson were fully aware that CNL was leasing a new facility and acquiring a new manufacturing line. In fact, Bhargava and Henderson insisted that CNL take these steps to increase its manufacturing capacity.

26.     Bhargava made numerous representations, via telephone calls, to Gill and Jones, during the summer and fall of 2006, that CNL must expand its manufacturing capacity because sales were going to explode due to an ongoing national advertising campaign and CNL would be required to meet that increased demand. Bhargava even consulted with CNL during the summer of 2006 about the purchase of new equipment for the new plant to be constructed by CNL. Likewise, Henderson also made numerous representations, via telephone calls, to Gill and Jones, during the summer and fall of 2006, that CNL must expand its manufacturing capacity because sales were going to explode and CNL would be required to meet that increased demand. Additionally, Henderson made the same representations to Alan Jones during his two day trip to CNL's facilities in May 2006.

27.     In reliance on Bhargava's and Henderson's representations that CNL would be called on to meet this greatly increased demand, CNL leased and built out a new production facility in Carrollton, Texas nearly tripling its over all square footage. CNL incurred costs

associated with the build out of the new facility of approximately $750,000. In reliance on Bhargava's and Henderson's representations that CNL would be called on to meet this greatly increased demand, CNL also ordered a new liquid production line.

28.    However, unknown to CNL, at the same time Living Essentials was insisting that CNL increase its production capacity, Living Essentials was bringing a new manufacturer on line for the express purposes of replacing CNL and ending the relationship with CNL. In fact, Bhargava and Henderson's statements to CNL, that CNL would be called upon to meet significantly increased demand for the Product were false when they were made as Living Essentials fully intended to terminate its relationship with CNL at the first available opportunity. Living Essentials believed that, by terminating the relationship with CNL, and sticking CNL with a large receivable and increased expenses related to its expansion, it could effectively drive CNL out of business thereby eliminating it as a competitor in the energy shot market.

**E.    Living Essentials Drops the Bomb.**

29.    In December of 2006, after CNL was financially committed to move to its new expanded facilities and had actually ordered a new liquid manufacturing line, Living Essentials demanded that CNL enter into a written agreement wherein CNL would agree to manufacture and package the Product at a substantially reduced price. At a meeting that occurred in Michigan in December, 2006, Henderson informed CNL that Living Essentials had signed a contract with another manufacturer to manufacture the Product at greatly reduced prices and presented a signed contract with the manufacturer, Royal Foods ("Royal"), dated in July 2006 to Jones.

30.    Henderson stated that if CNL wanted any more orders from Living Essentials, it would have to sign a contract, including a non-compete agreement and with prices consistent with the prices in the Royal contract.  Bhargava, on the other hand, attempted to alleviate CNL's concerns and represented that, due to the increased volume of production, CNL should concede to a price reduction and that if CNL signed the agreement, it would ensure the long term survival of the relationship between the parties and CNL would get all the production volume it could handle for years to come.

31.    However, unknown to CNL, Living Essentials had already decided to "get rid of" CNL even if CNL signed a new agreement.  In fact, Living Essentials was only offering to enter into a new agreement in order to cover Living Essentials' short term production needs due to a large order from a national pharmacy chain and in order to get CNL to sign a non-competition agreement.  At the time Living Essentials proffered the new agreement, it had no intention to honor its contractual obligations and fully intended to terminate the relationship with CNL as soon as it could get another manufacturer up and running.   In essence, Living Essentials extorted CNL into entering into a new agreement by threatening to stop placing orders with CNL and, instead, use another manufacturer to supply Living Essentials' needs for the Product.  Because of the increased expenses incurred or committed to by CNL as a result of Living Essentials' insistence that it expand its facilities, had Living Essentials stopped placing orders for the Product at that time, CNL would likely have gone out of business.

32.    At the time Living Essentials executed the Manufacturing Agreement between the parties (the "Manufacturing Agreement"), Living Essentials caused it to do so with the intent of reducing CNL's margins and driving up CNL's receivables.  Living Essentials intended to

breach the Manufacturing Agreement and attempt to force CNL out of the energy shot market, if not completely out of business. Living Essentials insisted that the Manufacturing Agreement include a non-compete provision even though CNL had created and owned the CNL Formula and the Manufacturing Processes. CNL sourced its own raw ingredients. Living Essentials took direct delivery of the Product, so CNL had no knowledge of CNL's distribution network. The non-competition provision of the Manufacturing Agreement served no legitimate business interest of Living Essentials. Rather, it was included in the Manufacturing Agreement simply to reduce competition in the energy shot market. In order to induce CNL into entering into the Manufacturing Agreement including a non-competition provision, Living Essentials promised CNL guaranteed minimum orders for over two years. Without the guarantee of over two years of minimum production volume, CNL would not have entered into an agreement which included a non-compete provision.

33.     Of course, CNL did not know at the time it executed the Manufacturing Agreement that Living Essentials intended to terminate the relationship, claim rights in the CNL Formula and thereafter attempt to drive CNL out of business. The Manufacturing Agreement was largely negotiated over the phone and via electronic mail.

34.     Without using the CNL Formula, the Genesis Printout, the Product Specifications and/or the Manufacturing Processes, Living Essentials would not be able to manufacture the Product itself or obtain the manufacturing of the Product by others than CNL.

**F.    Living Essentials Breaches the Manufacturing Agreement.**

35.     On June 8, 2007, Living Essentials issued a purchase order, P.O. No. 1412, to CNL for approximately 7,000,000 bottles of 5 Hour Energy (the "Purchase Order"). CNL

accepted the Purchase Order and began filling it. In order to do so, CNL was required to obtain

large quantities of the raw materials for the Product. Living Essentials knew that CNL would

have to acquire such raw materials.

36.     Additionally, beginning in early September 2007, Living Essentials slowed down

the payment of CNL's invoices. Prior to September 2007, Living Essentials routinely paid

CNL's invoices within ten days which entitled Living Essentials to a discount on the amount of

the invoice. However, beginning in September 2007, and in an effort to drive CNL's receivables

up in anticipation of Living Essentials' termination of the manufacturing Agreement, Living

Essentials stopped paying CNL's invoices. When CNL inquired about the status of payment,

Living Essentials informed CNL that it had decided to pay CNL's invoices on a thirty day cycle

and would forego the discount.

37.     On October 2, 2007, Living Essentials sent Matt Dolmage to CNL's facilities to

conduct a physical inventory of the packaging components for the Product which were provided

by Living Essentials. Living Essentials knew that the inventory reports provided by CNL, as it

relates to packaging components, were not reliable. Living Essential insisted that CNL keep its

production running and was aware that CNL's reported inventory of packaging components was

simply an estimate of what "should" be in CNL's inventory. CNL and Living Essentials both

anticipated that, at some point in time, a physical inventory would be conducted and, in the event

that there were shortages in packaging components, CNL would issue a credit memo for the cost

of such excess scrap.

38.     The physical inventory performed by Dolmage established the amount of

packaging components in CNL's inventories at that time and also established the amount of the

actual discrepancy between CNL's inventory reports and CNL's actual physical inventory. Once the actual differential was determined, on October 2, 2007, CNL requested Living Essentials to provide it with its costs for such excess scrap so it could issue a credit memo to Living Essentials. Living Essentials had already calculated the amount of the loss due to scrap as $45,282.36. Nevertheless, it refused to provide CNL with that information so that CNL could issue a credit memo.

39. Further, Living Essentials deliberately sent CNL packaging components in small batches. It did so in anticipation of terminating the relationship with CNL. This practice exacerbated the problems with maintaining accurate inventories of the packaging components. Living Essentials intended to terminate the relationship with CNL imminently and Living Essentials wanted to establish a reliable inventory at CNL's facilities as part of its plan to terminate the relationship with CNL.

40. Shortly after the visit from Matt Dolmage, Living Essentials contacted CNL and notified it of the discovery of Product being sold at an unapproved distributor of 5-Hour Energy. CNL immediately opened an investigation into the complaint and discovered, upon reviewing video surveillance, that a former employee of CNL, Gilbert Hernandez had stolen a relatively small amount of Product from CNL's facilities in Texas (the "Product Theft"). CNL contacted Living Essentials and informed Living Essentials that it had discovered the Product Theft and its source and further informed Living Essentials that the police were investigating the matter and attempting to recover the stolen Product.

41. Using the Product Theft as a pretense, Living Essentials wrongfully terminated the Manufacturing Agreement. In this regard, Henderson informed CNL orally on October 19,

2007, that Living Essentials was ending its relationship with CNL. Specifically, Henderson told Jones that, "we're done with you guys, OK, so now we just got to figure out how to get it done in an amicable or litigious manner." Living Essentials provided no written notice of breach, no opportunity to cure and no written notice of termination, all required by the Manufacturing Agreement.

42.     During the October 19, 2007, call, Jones discussed with Henderson what the procedure would be to reconcile the accounts of CNL and Living Essentials. The parties agreed that they would reconvene to finalize the reconciliation on the following business day. Henderson, however, demanded the immediate return of all labels for the Product, because he had allegedly "lost trust" in CNL's ability to protect and safeguard the Product. Under the Manufacturing Agreement, Living Essentials was required to provide CNL with an adequate supply of packaging materials, including labels. CNL complied with the demand and returned the remaining product labels to Living Essentials, but for a small quantity which were not discovered by CNL until some months later. The demand for the return of the labels effectively prevented CNL from manufacturing any additional Product pursuant to the open Purchase Order.

43.     However, even though Henderson had agreed to reconvene a conference call to reconcile the accounts of CNL and Living Essentials on the next business day, October 22, 2007, neither Henderson nor anyone else at Living Essentials was "available" to discuss these matters with CNL on October 22, 2007, or any time thereafter. In fact, unbeknownst to CNL, Living Essentials had no intention of "settling up" and instead intended to withhold payment of CNL's outstanding receivables hoping to drive CNL out of business.

44.     Despite Henderson's agreement to reconcile the accounts of CNL and Living Essentials on October 22, 2007, Living Essentials refused to pay CNL's invoices for Product which had already been manufactured by CNL and delivered to Living Essentials and has failed to pay CNL for the remaining raw materials in CNL's inventory which CNL acquired on behalf of Living Essentials.  Specifically, without justification or excuse, and despite demand, Living Essentials failed and refused, and continues to fail and refuse, to pay CNL $253,866.67 due to CNL for goods and services provided as set forth herein.

45.     On November 1, 2007, CNL made demand on Living Essentials to (1) pay the outstanding invoices (2) comply with the minimum purchase requirements under the Manufacturing Agreement and (3) return all confidential information to CNL, including the CNL Formula.  However, Living Essentials continues to refuse to pay CNL for Product which had already been manufactured by CNL, has failed to provide CNL with labels and packaging materials to allow CNL to continue to manufacture the Product, has failed to comply with the minimum order requirements under the Manufacturing Agreement, has failed to pay CNL for the remaining raw materials in CNL's inventory which CNL acquired on behalf of Living Essentials and continues to use the CNL Formula and Manufacturing Processes in clear violation of the Confidentiality Agreement and CNL's Standard Terms and Conditions of Sale.

46.     Accordingly, CNL sold off its remaining inventory of the Product to a third party in approximately January 2008 in order to mitigate its damages.  However, prior to selling the inventory to a third party, CNL offered to sell all remaining inventory to Living Essentials at the price dictated by the Manufacturing Agreement.  CNL also offered to return all packaging components bearing the product name "5 Hour Energy."  This offer was made orally in early

November 2007 and in writing on or about December 15, 2007. Living Essentials did not respond to these offers for over two months. As a result of Living Essentials' unreasonable delay in responding to the offers, CNL believed that Living Essentials had no good faith intention to actually purchase the remaining inventory and only intended to prevent CNL from liquidating its inventory on the open market to mitigate its damages.

47. Additionally, in the spring of 2008, CNL discovered that it still had approximately 120,000 labels for the Product which had been provided by Living Essentials but which had been overlooked when Living Essentials demanded the return of its labels. Accordingly, CNL used a portion of the raw materials it had acquired for Living Essentials and manufactured a final batch, approximately 120,000 bottles, of the Product pursuant to the open Purchase Order in approximately May 2008. CNL affixed its remaining genuine labels to the genuine Product it produced and also sold this batch of product to a third party in approximately June 2008 to further mitigate its damages. Unbeknownst to CNL, the third party to whom such product was sold was acting on behalf of, and as the undisclosed agent of Living Essentials. Accordingly, CNL actually sold this batch to Living Essentials.

48. Living Essentials has engaged in the foregoing conduct in order to drive CNL out of business, thereby eliminating it as a competitor in the energy shot market. Now, Living Essentials is using the stolen CNL Formula, Genesis Printout, Product Specifications and/or Manufacturing Processes to manufacture the Product elsewhere.

49. Bio Clinical has also disclosed the CNL Formula or a close derivative thereto, to the USPTO in one or more pending patent applications. As a result, the CNL Formula, or

substantial parts thereof, will be published to the public as a result of Living Essentials' and Bio Clinical's wrongful conduct.

50.     Because Living Essentials has breached the Manufacturing Agreement, CNL is not bound to continue performance of the agreement, including the non-competition provision. Further, the consideration for the non-competition provisions has wholly failed.  In this regard, Living Essentials agreed to order at least 1,500,000 bottles of the Product for each of nine consecutive calendar quarters.  Living Essentials only honored this agreement for two quarters. Since Living Essentials has refused to pay for the Product and has failed to meet its minimum order obligations thereunder, CNL has begun manufacturing other energy shots, including a product known as Mini Thin Rush (the "BDI Product"), which includes the phrase "6 Hour Energy" on its label.

**G.      Living Essentials' False Advertising.**

51.     On March 7, 2008, Living Essentials filed a trademark infringement suit against N2G Distributing, Inc. and Alpha Performance Labs in the United States District Court for the Eastern District of Michigan, case no. 2:08-cv-10983 (the "N2G Action").  In the N2G Action, Living Essentials complained about N2G's distribution of a product called 6 Hour Energy. Living Essentials sought and obtained a preliminary injunction enjoining N2G from selling its 6 Hour Energy product in its then packaging; however, the Michigan Federal Court denied Living Essentials' request to enjoin N2G from distributing a 2 ounce nutritional supplement bearing the mark "6 Hour Energy."  The Michigan Court found:

> Given the fact that "5 Hour Energy" is highly descriptive, the Court finds that Plaintiff has not carried its "heavy burden," at this point in the case, to demonstrate that the primary significance of "5 Hour Energy" is to "identify the source of the product rather than the product itself." Furthermore, Defendants

have produced a variety of competing two-ounce energy drink products from different manufacturers that use phrases such as "7 Hour Energy Boost," "6 Hour Energy!," "Extreme Energy Six Hour Shot," and "6 Hour Power" – thus diluting the Plaintiff's potential claim that "5 Hour Energy" has a strong secondary meaning that particularly identifies its source.

Therefore, the Court does not find that at this point in the case Plaintiff has demonstrated a "strong likelihood of success" on its trademark claim to support a preliminary injunction.

52.    The Michigan court did, however, enjoin N2G from distributing its 6 Hour Energy Product with its then current labeling on the grounds that the product copied Living Essentials' trade dress.  On or about May 29, 2008, Living Essentials issued a "legal notice" to customers entitled "RECALL OF '6 HOUR' SHOT ORDERED" ("the Legal Notice"). The Legal Notice represented that Living Essentials had obtained an order requiring the recall of "6 Hour Energy."  Upon information and belief, the Legal Notice was transmitted via mail, private carrier, and wire, via facsimile and/or email.

53.    On June 14, 2004, Living Essentials filed an application with the United States Patent & Trademark Office ("USPTO") for a trademark for the product name "5 Hour Energy," covering "homeopathic supplements, pharmaceutical preparations, nutritional supplements and dietary supplements that relieve or prevent fatigue."  On January 20, 2005, the USPTO rejected Living Essentials' application for a trademark on the grounds that the mark is merely descriptive.

54.    On July 15, 2008, Living Essentials filed trademark application no. 77522602 seeking again to register the product name  "5 Hour Energy" on the Principal Trademark Register (the "2008 Application").  In the 2008 Application, Living Essentials sought to establish with the USPTO that the product name "5 Hour Energy" had acquired distinctiveness;

however, the USPTO again refused registration finding that Living Essentials had failed to establish that the mark had acquired distinctiveness.

55.     On June 24, 2008, Living Essentials sued BDI Marketing, a division of Body Dynamics, Inc. ("BDI"), in the United States District Court for the Eastern District of Michigan, case no. 2:08-cv-12711 (the "BDI Action").  Living Essentials sued BDI for trademark infringement for its manufacture and sale of the BDI Product.

56.     BDI counterclaimed against Living Essentials and sought injunctive relief against Living Essentials because of Living Essentials' distribution of the Legal Notice.  BDI argued that the Legal Notice was deceptive in that it suggests that Living Essentials had obtained an injunction against the distribution of all energy drinks bearing the label "6 Hour Energy." Distributors stopped buying the BDI Product, which was manufactured by CNL, as a result of the Legal Notice.  The Magistrate Judge agreed that the Legal Notice was deceptive and recommended entry of a preliminary injunction requiring Living Essentials to distribute a corrective statement.  The Report and Recommendation, which was adopted by the District Court and resulted in a preliminary injunction, finds:

> The press release is misleading in that it states that Living Essentials "won a decision against a '6 Hour' energy shot that closely mimicked 5-Hour energy," when in fact, they won a trade dress injunction against N2G, the opposing party. . . . Judge Borman had specifically denied a preliminary injunction against N2G's use of the highly descriptive phrase "6 Hour Energy Shot" in connection with energy shots, in part because three other manufacturers use the six hour phrase in connection with their energy shots. As quoted above Judge Borman noted how other drinks such as "7 Hour Energy Boost," "6 Hour Energy!," "Extreme Energy Six Hour Shot," and "6 Hour Power" were distributed in the market place diluting Plaintiff's potential claim that "5 Hour Energy" has a strong secondary meaning that particularly identifies its source. (Dkt. #12, Exhibit H, Page 8). It was the similarity of the trade dress that was the basis of the injunction, not the use of the term "'6 Hour' energy." Living Essentials did not win a decision against a "'6 Hour' energy shot" as stated in the press release, but rather won a decision

against N2G's use of a overall product image (i.e. - the label and bottle) that was confusingly similar to Living Essentials' overall product image.

. . .

For the reasons stated above, IT IS RECOMMENDED that Defendant/Counterclaimant's motion for preliminary injunction be GRANTED. IT IS FURTHER RECOMMENDED that Living Essentials be ordered to issue a clarification to all customers receiving its earlier correspondence and in the LEGAL NOTICE section of Convenience Store News that the federal court recall was limited to N2G's "6 Hour Energy Shot"because of the similarity of its label and bottle to Living Essentials 5 HOUR ENERGY® and clarifying specifically that BDI's MINI THIN RUSH® was not and is not subject to that or any court ordered recall.

57.     On April 30, 2009, Living Essentials and BDI submitted a joint stipulation of dismissal, wherein all claims and counter-claims were dismissed ***with prejudice***. The dismissal states that BDI and Living Essentials reached a settlement of their dispute.

58.     In addition to the foregoing, Living Essentials has recently circulated advertising material in which it claims to be the "original 2 oz. energy shot." This claim is demonstrably false. In the United States, Shotzs was the original 2 ounce energy shot. In fact, as set forth above, Living Essentials got the inspiration for the Product from Shotzs.

## G.    Living Essentials Intended to Terminate the CNL Relationship and Told its Employees to Keep it Secret.

59.     Living Essentials decided to get rid of CNL as a manufacturer in the summer of 2006. At that time, Living Essentials began the process, described above, to bring a new manufacturer of the Product online, acquired additional CNL trade secrets from CNL and disclosed such secrets, including the Genesis Printout, to the new manufacturer. At all relevant times, Bhargava instructed the employees of Living Essentials not to disclose to CNL that Living Essentials was establishing a new manufacturing relationship or intended to terminate the

relationship with CNL.  In fact, Bhargava and Henderson instructed the employees of Living Essentials to slow down the payment of CNL's receivables and to limit the packaging components delivered to CNL so that, when the relationship was terminated, Living Essentials would owe CNL as much money as possible and leaving CNL with as little of Living Essentials' property as possible thereby maximizing Living Essentials' economic leverage against CNL.

60.     Although Living Essentials had acquired the CNL Formula from CNL, albeit subject to confidentiality restrictions which it has ignored, Living Essentials still did not possess the secrets related to the flavor additives CNL used to flavor the Product.  Accordingly, and again under false pretenses, during the summer of 2006, Living Essentials acquired unflavored base samples of the Product from CNL so it could attempt to "knock off" CNL's secret flavoring.  Living Essentials did not, at that time, have the expertise to manufacture its own unflavored base and, but for obtaining these samples from CNL, it would not have been able to "knock off" CNL's flavor.  Further, even if Living Essentials had the expertise to manufacture unflavored base for the product, to do so in an effort to "knock off" CNL's flavor would clearly violate the Confidentiality Agreement and the confidentiality provisions of CNL's Standard Terms and Conditions.  Living Essentials instructed its employees not to disclose to CNL that it was attempting to "knock off" CNL's proprietary flavor.

## H.     Living Essentials is Operating a Criminal Enterprise.

61.     Living Essentials conducts one or more enterprises effecting interstate commerce through a pattern of racketeering activity.  By reason of such conduct, CNL has suffered injury.

62.     Royal Foods Products, LLC is an enterprise engaged in and whose activities effect interstate commerce.  Living Essentials is associated with Royal.

63.    Liquid Manufacturing, LLC ("Liquid") is an enterprise engaged in and whose activities effect interstate commerce.  Living Essentials is associated with Liquid.

64.    Living Essentials is an entity capable of holding a legal or beneficial interest in property.

65.    Living Essentials and Bio Clinical agreed to and did conduct and participate in the conduct of the affairs of both Royal and Liquid trough a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding CNL and misappropriating CNL's trade secrets.

66.    Both Royal and Liquid have a legitimate structure and heirarchy that is distinct from that inherent in Living Essentials' pattern of racketeering.

67.    Bhargava is member of Living Essentials and acts as its CEO.

68.    Bhargava is also a shareholder and the CEO of Bio Clinical.

69.    Pursuant to and in furtherance of their fraudulent scheme, Living Essentials and Bio Clinical committed multiple related acts.

70.    At the inception of the relationship between Living Essentials and CNL, Living Essentials misrepresented its intent to become a manufacturer of the Product.  More specifically, at a meeting that occurred in Dallas, Texas on May 12, 2004, Bhargava, as Living Essentials' CEO, represented to Jones, CNL's CEO, that CNL did not need to be concerned about Living Essentials' violating any confidentiality agreement between the parties because Living Essentials was a marketing company only, and that Living Essentials would never become involved in manufacturing.  This representation was false when made and was intended to deceive and mislead CNL. Within weeks of making these representations, Living Essentials purported to

transfer ownership of the CNL Formula to Bio Clinical and take a license back of the right to use the CNL Formula in the Energy Shot Market.

71.     On June 29, 2004, Bhargava sent an email to CNL in Dallas requesting that CNL provide him with the CNL Formula.  CNL did not respond.  Thereafter, on July 12, 2004, the email was forwarded again by Bhargava to CNL requesting the CNL Formula.  Accordingly, on July 13, 2004, CNL faxed the Genesis Printout to Living Essentials in Michigan .  Before faxing the Genesis Printout, Gill called Morse and informed him that the CNL Formula was the proprietary property of CNL and that CNL would not disclose it unless Living Essentials acknowledged that the CNL Formula was the property of CNL and would agree not to disclose it, except to its insurance company.  Morse agreed, on behalf of Living Essentials, that the CNL formula was the proprietary property of CNL and the Genesis Printout would only be used for the stated insurance purpose.  However, Living Essentials did not seek to acquire the CNL Formula solely for the stated insurance reason.  Rather, Living Essentials, whether Morse knew it or not, intended to misappropriate the CNL Formula as evidenced by the almost immediate purported assignment of the CNL Formula to Bio Clinical.

72.     Thereafter, on or about April 19, 2005, Living Essentials requested, via email, further detailed information regarding the CNL Formula purportedly in order to gain approval to import the Product into Canada.  Accordingly, and pursuant to the terms of the Confidentiality Agreement and the Standard Terms and Conditions under which the Product was sold, CNL provided the Product Specifications to Living Essentials.  Again, Living Essentials did not seek to acquire the Product Specifications solely for the stated regulatory reason.  Rather, Living Essentials intended to misappropriate the Product Specifications.

73.    In May 2006, Living Essentials sent its president, Henderson, to CNL's Dallas facilities to observe CNL's Manufacturing Processes.  Henderson affirmatively represented to Jones during his trip to Dallas that he was simply interested in understanding the Manufacturing Processes out of curiosity.  During the trip, Henderson observed the details of CNL's Manufacturing Processes for two days.  Henderson asked specific questions of CNL to determine how the Manufacturing Processes were performed.  Henderson was gathering this information because Living Essentials' new manufacturer had no experience manufacturing nutritional supplements, being a manufacturer of salad dressing and barbeque sauce, and neither Living Essentials nor its new manufacturer understood  how the Manufacturing Processes needed to be performed.  Henderson did not disclose that Living Essentials wanted to acquire the Manufacturing Processes for purposes of having the Product manufactured by another manufacturer.  The confidential relationship between the parties as a result of the Confidentiality Agreement and the duty of good faith and fair dealing implied into the Confidentiality Agreement by Michigan law required Living Essentials to disclose such information and that lack of disclosure amounted to fraud.

74.    The foregoing conduct constitute three separate and distinct violations of 18 U.S.C. Section 1832.  More specifically, Living Essentials stole, or without authorization appropriated, took, carried away, or concealed, or by fraud, artifice, or deception obtained the CNL Formula, the Product Specifications and the Manufacturing Processes.  Additionally, Living Essentials, without authorization, copied, duplicated, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, communicated, or conveyed the CNL Formula, the Genesis Printout, the Product Specifications

and/or the Manufacturing Processes.  Further, Bio Clinical received, bought, or possesses the

CNL Formula, the Genesis Printout, the Product Specifications and/or the Manufacturing

Processes knowing the same to have been stolen or appropriated, obtained, or converted without

authorization.

75.    In the summer of 2006, Living Essentials, with the knowledge and consent of Bio

Clinical, secretly entered into a relationship with a contract manufacturer located in Indiana,

Royal.

76.    Living Essentials provided Royal with the Genesis Printout.

77.    Because Living Essentials had redacted the fax line from the Genesis Printout

which indicated that CNL was the origin of the CNL Formula, Royal had no way of knowing

that the Genesis Printout was, in fact, a misappropriated trade secret of CNL.  Living Essentials

engaged in all such conduct on behalf of and with the consent and complicity of Bio Clinical

who profited from the arrangement through the payment of licensing fees.

78.    Bio Clinical also included the CNL Formula, or a derivative thereof, in one or

more patent applications filed with the USPTO.

79.    Living Essentials wrongfully obtained the CNL Formula, the Genesis Printout,

the Product Specifications and the Manufacturing Processes from CNL and then transported,

transmitted and/or transferred them in interstate commerce with the intent to exploit the same for

its own benefit.  Specifically, Living Essentials transported, transmitted and/or transferred the

CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes

to Bio Clinical, Royal and Liquid.  Likewise, Living Essentials distributed the CNL Formula, the

Genesis Printout, the Product Specifications and the Manufacturing Processes to its own

manufacturing facility located in Indiana. Living Essentials, itself, and through Royal and Liquid, then used the CNL Formula, the Product Specifications and the Manufacturing Processes to manufacture goods which Living Essentials then distributed, and continues to distribute, throughout the United States of America and Canada. Living Essentials also transported, transmitted and/or transferred the CNL Formula and the Genesis Printout across state lines to one or more consultants for purposes of assisting the consultants in the consultants' efforts to improve upon the CNL Formula and Bio Clinical transported, transmitted and/or transferred the CNL Formula in one or more patent applications filed with the USPTO.

80. As set forth above, Living Essentials acquired the CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes through fraud and under an obligation of confidentiality. Living Essentials had no right or authority to use the CNL Formula and was only authorized to disclose the CNL Formula as necessary to its insurance company. Living Essentials has no right or authority to use or disclose the Genesis Printout, the Product Specifications or the Manufacturing Processes at all.

81. The CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes are not in the public domain and constitute CNL's trade secrets. The CNL Formula constitutes goods, wares, merchandise, securities or money worth more than $5,000. The Genesis Printout constitutes goods, wares, merchandise, securities or money worth more than $5,000. The Product Specifications constitute goods, wares, merchandise, securities or money worth more than $5,000. The Manufacturing Processes constitute goods, wares, merchandise, securities or money worth more than $5,000.

82.     With full knowledge of the value and proprietary nature of the CNL Formula, Bio Clinical claims to have acquired the CNL Formula from Living Essentials which was under a duty not to disclose the CNL Formula.

83.     Living Essentials and Bio Clinical knowingly and/or intentionally exerted and continue to exert unauthorized control over the CNL Formula with the intent to deprive CNL of the value or use of the CNL Formula and to profit from using it as a basis for the Product and the pending patent applications.

84.     Living Essentials provided its other two manufactures with the CNL Formula and the Manufacturing Processes in 2006 and 2007.

85.     Living Essentials and Bio Clinical knowingly or intentionally exerted and continue to exert unauthorized control over the CNL Formula and unlawfully transferred and/or duplicated the CNL Formula and the Genesis Printout in interstate commerce.

86.     Living Essentials used the CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes for its own personal gain.

87.     Living Essentials and Bio Clinical conspired to obtain the CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes and to use the CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes to obtain the manufacturing of the Product with manufacturers other than CNL at greatly reduced manufacturing costs.

88.     Additionally, during the summer of 2006, Living Essentials induced CNL to move its facilities, at great expense to CNL, by representing that sales were soon to explode and CNL would need to greatly increase its manufacturing capacity.  Bhargava made representations,

via telephone calls, to Gill and Jones, during the summer and fall of 2006, that CNL must expand its manufacturing capacity because sales were going to explode and CNL would be required to meet that increased demand.  Bhargava even consulted with CNL during the summer of 2006 about the purchase of new equipment for the new plant to be constructed by CNL.  Likewise, Henderson made numerous representations, via telephone calls, to Gill and Jones, during the summer and fall of 2006, that CNL must expand its manufacturing capacity because sales were going to explode and CNL would be required to meet that increased demand.  Additionally, Henderson made the same representations to Jones during his two day trip to CNL's facilities in May 2006.  In reliance on Bhargava's and Henderson's representations that CNL would be called on to meet this greatly increased demand, CNL leased and built out a new production facility in Carrollton, Texas nearly tripling its over all square footage.  CNL incurred costs associated with the build out of the new facility of approximately $750,000.  In reliance on Bhargava's and Henderson's representations that CNL would be called on to meet this greatly increased demand.  CNL also ordered a new liquid production line.

89.    However, unknown to CNL, at the same time Living Essentials was insisting that CNL increase its production capacity, Living Essentials was bringing a new manufacturer on line for the express purposes of replacing CNL and ending the relationship with CNL.  In fact, Bhargava and Henderson's statements to CNL, that CNL would be called upon to meet significantly increased demand for the Product, were false when they were made as Living Essentials fully intended to terminate its relationship with CNL at the first available opportunity. Living Essentials believed that, by terminating the relationship with CNL, and sticking CNL

with a large receivable and increased expenses related to its expansion, it could effectively drive

CNL out of business thereby eliminating it as a competitor in the Energy Shot Market.

90.     The foregoing conduct constitutes repeated violations of 18 U.S.C. §§ 1341 and

1343.  As more specifically set forth above, Living Essentials, through it's corporate officers,

acting within the course and scope of their duties as corporate officers, with the full authority

and authorization to act on behalf of Living Essentials, devised or intended to devise a scheme or

artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises and in furtherance thereof transmitted or caused to be transmitted by

means of mail, private carrier, wire or radio in interstate or foreign commerce, multiple writings,

signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.  Each

such writing, sign, signal, picture, or sound constitutes a separate violation of 18 U.S.C. §§ 1341

and 1343.

91.     The CNL Formula, the Product Specifications and the Manufacturing Processes

comprising intangible property are effectively made material or tangible by their embodiment in

specifications and other documents, including the Genesis Printout, and therefore constitutes

"goods, wares or merchandise" within the meaning of 28 U.S.C. § 2314.

92.     Living Essentials coordinated and participated in the misappropriation of the CNL

Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes,

trafficking in stolen or misappropriated CNL trade secrets, and using those trade secrets to

manufacture the Product itself and obtain the manufacturing of the Product by Royal and Liquid.

Living Essentials obtained a necessary cost benefit by using the CNL Formula, the Genesis

Printout, the Product Specifications and the Manufacturing Processes because they avoided

having to replicate all the research, development and testing thereby reducing their overhead and allowing them to obtain the manufacturing of the Product at significantly reduced costs.

93.    Living Essentials trafficked in stolen property at least in 2004 when it purported to assign the ownership of the CNL Formula to Bio Clinical.  Additionally, Living Essentials trafficked in stolen property in 2006 and 2007 when it provided the CNL Formula and the Manufacturing Processes to its other two manufacturers.  Because Living Essentials actively concealed its purported transfer of the CNL Formula to Bio Clinical, and because it further actively disclosed its ongoing fraud, CNL did not, and through the exercise of reasonable diligence, could not discover Living Essentials' purported misappropriation, disclosure and transfer of CNL's trade secrets until during the course of this litigation.

94.    Living Essentials' unlawful acts in the trafficking of misappropriated or stolen CNL trade secrets constitute at least four discrete acts of transportation, transmission, or transfer of stolen goods in violation of 18 U.S.C. § 2314: (1) the 2004 assignment to Bio Clinical; (2) the 2006 transmission to Royal; (3) the 2007 transmission to Liquid; and (4) the 2008 transmission to its manufacturing facilities in Indiana.

95.    The CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing processes each has a value of well over $5,000. The CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes comprise the culmination of years of research and development and financial resources.

96.    Living Essentials knew the CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes in which it was trafficking were stolen or converted from CNL.

97.    Living Essentials, through its lawyers, has also threatened witnesses in this, and other federal litigation, with expensive and harassing lawsuits if they testify or provide evidence therein in violation of 18 U.S.C. § 1512.  Specifically, Living Essentials' lawyers contacted Morse and informed him that he would be sued by Living Essentials if he testified in this lawsuit or the pending state court action between the parties, unless he were compelled by subpoena to do so.  In fact, a lawyer representing Living Essentials advised Morse that if he did not ignore a Texas subpoena, service of which Morse's lawyer had accepted, Living Essentials would sue him for violating a separation agreement between Living Essentials and Morse.  As a result, Morse is unwilling to travel to Texas to testify in this action.[3]  Likewise, following the voluntary testimony of Kevin Zwierzchowski in the state court action, Living Essentials sued Zwierzchowski in retaliation for giving such testimony making it unlikely that Zwierzchowski will voluntarily travel to Texas to testify herein.

98.    Additionally, as set forth above, Living Essentials caused the issuance of the deceptive Legal Notice and has falsely claimed in its advertising that it is the original 2 ounce energy shot.  The Legal Notice is false and deceptive as set forth above.  The Legal Notice was issued by Living Essentials and transmitted by mail and wire across state lines with the express purpose of misleading distributors into believing that the sale of "6 Hour" products other than N2G's product had been enjoined and to encourage those distributors not to buy such other "6 Hour" products.  The BDI Product is one of the other "6 Hour" products and sales of the BDI Product were negatively impacted by the Legal Notice.  Accordingly, CNL, as the manufacturer

---

[3]Although Morse does maintain an offices in both Texas and Michigan, his Texas office is in Houston which is beyond the subpoena range of this Court.

of the BDI Product, was damaged by the issuance of the Legal Notice. Likewise, CNL, as a manufacturer of a number of 2 ounce energy shots, is damaged by the false advertising that "5 Hour Energy" is the original 2 ounce energy shot when, in fact, it is not.

99.    On October 29, 2007, CNL filed a lawsuit against Living Essentials in the County Court at Law No. 5, Dallas County, Texas, Cause No. 07-14515-E (the "State Court Action"). On November 1, 2007, CNL demanded the immediate return of all of its confidential information, including the CNL Formula. On November 9, 2007, Living Essentials filed an action against CNL in the United States District Court for the Eastern District of Michigan. On November 29, 2007, Matthew S. Dolmage, Living Essentials CFO, circulated an email to all of the employees of Living Essentials informing them to preserve their documents related to CNL. On November 26, 2007, Living Essentials removed the State Court action to the United States District Court for the Northern District of Texas. On December 17, 2007, Living Essentials filed a counterclaim against CNL in the State Court action (while on removal). On April 22, 2008, Judge Godbey remanded the State Court action back to the Dallas County Court at Law. On February 11, 2008, the United States District Court for the Eastern District of Michigan dismissed the action filed by Living Essentials in Michigan.

100.    On June 6, 2008, CNL served Living Essentials with, among other written discovery, its First Request for Production of documents in the State Court Action. Subsequently, these same requests were duplicated in this action.    Request for production no. 2 requests "any and all agreements between Living Essentials and any manufacturer, processor, assembler, raw ingredient supplier, or bottler of 5 Hour Energy, since January 1, 2005." Request for production no. 3 requests "Any and all documents which set forth the Formula." "Formula"

was defined as "the recipe, list of ingredients, flavoring, processing or blending methodologies, or any portion thereof, relating to '5 Hour Energy.'"

101.    On June 10, 2008, Living Essentials served CNL, in the State Court Action, with Defendant Living Essentials' First Written Discovery Requests to Plaintiff.  The instructions contained in Living Essentials' first written discovery to CNL provide **"Living Essentials further requests that all documents and/or other data compilations that concern the subject matter of this litigation be preserved and that any ongoing process of document destruction involving such documents cease immediately."**

102.    On June 26, 2008, Living Essentials filed this action against CNL and Ultimate Lifestyles.  Living Essentials sought injunctive relief related to CNL's sale of 5 Hour Energy.  Ironically, Living Essentials sought an *ex parte* seizure order which was supported by Henderson's declaration in which Henderson himself expresses concerns over the potential destruction of relevant documents and evidence.  Further, Henderson was present and testified at the temporary injunction hearing on July 7, 2008.  During Henderson's testimony, while Henderson was actually on the stand, the Court inquired as to the relevance of certain questions posed by counsel for Defendants.  In response, with Henderson still on the stand, counsel for CNL stated:

> There is a dispute about the formulation, your Honor. The confidentiality agreement, which has been entered into evidence, provided that the parties would maintain certain confidentiality.  It's our contention, it's CNL's contention-and we'll be able to establish this, I think-that they developed the product, and that they owned the formula; that they were defrauded by misrepresentations into releasing the formula to Living Essentials, at which time Living Essentials got other manufacturers to do their manufacturing and then terminated their relationship with CNL, and what basically amounts to nothing more than a misappropriation of CNL's trade secrets and a theft.

103.     Additionally, on July 9, 2008, CNL filed its First Amended Original Petition in the State Court action.  In its amended petition, CNL specifically alleges the following:

16.     Living Essentials did not originally possess the Formula or the knowledge and technology associated with the Formula.  However, Living Essentials represented to CNL that it required the Formula in order to gain approval to import the Product into Canada.  Accordingly, pursuant to the terms of the Confidentiality Agreement, CNL provided the Formula to Living Essentials.  It was understood by Living Essentials management that the Formula was to be treated as confidential and used only for the requested regulatory purpose.

17.     Living Essentials, however, deceived CNL.  They did not seek to obtain the Formula for purposes of importing the Product into Canada.  However, it also sought the disclosure of the Formula so that it could have the Product manufactured by other vendors. Apparently, Living Essentials had previously tried to have other vendors manufacture the Product, but they were unsuccessful without the Formula.  Living Essentials determined that it could obtain manufacturing of the Product from other vendors at less cost since such vendors did not have any research and development costs which needed to be recouped.  As sales volume grew, Living Essentials decided that it could manufacture the Product itself.  Living Essentials also assumed that, by terminating the relationship with CNL, and sticking CNL with a $300,000.00 receivable, it could effectively drive CNL out of business thereby eliminating it as a competitor in the energy shot market.

18.     In December of 2006, immediately following CNL's move to its new facilities, Living Essentials demanded that CNL enter into a written agreement wherein CNL agreed to manufacture and package the Product, which by that time was known as "5-Hour Energy" (the "2007 Agreement").  At a meeting that occurred in December, 2006, Living Essentials' President informed CNL that he already had a signed contract with two (2) other manufacturers to manufacture the Product at greatly reduced prices and presented a signed contract with Royal Food of Indianapolis, Indiana to CNL's CEO.  In this agreement, CNL was forced to take a 29 % price reduction.  Living Essentials threatened that if CNL refused, it would cease ordering from CNL and obtain the Product from other contract manufacturers.  CNL was not previously aware that Living Essentials had provided the Formula to another manufacturer.  If Living Essentials stopped ordering the Product at that time, CNL's expanded production lines would have been idle and CNL would have been forced out of business.  Of course, CNL did not know that Living Essentials intended to terminate the relationship, claim rights to the Formula, and thereafter attempt to drive CNL out of business.

104.    On June 18, 2008, CNL noticed the deposition of Morse, Living Essentials' former president, to take place in Dallas on July 1, 2008.  The deposition was scheduled by the mutual agreement of the parties and the witness had agreed to travel to Dallas for the deposition. The day before the deposition was scheduled to take place, counsel for Morse contacted counsel for CNL and informed him that Morse had received a letter from Living Essentials' lawyers threatening to sue Morse if he appeared at the scheduled deposition.  According to Morse's lawyer, Living Essentials lawyers asserted that the separation agreement between Living Essentials and Morse precluded Morse's testimony, except under subpoena or by court order. CNL's counsel immediately requested a copy of the letter from Living Essentials' counsel. Living Essentials has refused to produce the letter.

105.    Thereafter, the parties and the witness agreed to reschedule Morse's deposition to take place in Michigan on August 12, 2008.  In connection with the August 12, 2008, deposition, Morse's counsel agreed to and did accept service of a Texas subpoena on behalf of Morse. However, on August 12, 2008, immediately prior to the commencement of the deposition and despite that counsel for CNL and a CNL representative had already traveled to Michigan for the deposition, one of Living Essentials' attorneys of record herein, Patrick McCarthy ("McCarthy"), informed Morse's attorney that, if Morse testified he would be in breach of the separation agreement with Living Essentials and would be subject to being sued by Living Essentials.  When McCarthy was shown the Texas Subpoena, he asserted that the subpoena was not valid to compel the witness' attendance and that the witness, if he chose to testify, was doing so "voluntarily."  As a result of the treat of litigation against the witness, the deposition was cancelled.  Eventually, Morse was served with a federal subpoena and sat for deposition.  In his

deposition, Morse testified, as set forth above, that the CNL Formula is the proprietary intellectual property of CNL, not Living Essentials. Morse also testified that he had been threatened with litigation by Living Essentials if he voluntarily testified in this action.

106. Because Living Essentials refused to properly respond to the first request for production, along with the other written discovery served on Living Essentials at that time, on July 23, 2008, CNL filed its motion to compel and for entry of protective order. As a result of the motion to compel, on August 25, 2008, the State Court entered an order on Plaintiff's motion to compel. The order on Plaintiff's motion to compel overruled a number of Living Essentials' frivolous objections to discovery and ordered Living Essentials to produce responsive documents to CNL on or before September 15, 2008. The order further:

> ORDERED that, on or before September 15, 2008, to the extent Living Essentials withholds any information or material from discovery pursuant to any privilege, objection, or otherwise, Living Essentials shall provide a log of the information and material withheld. For information on material withheld pursuant to any privilege, Living Essentials shall state that information or material responsive to the request has been withheld, identify the information being withheld, and identify the privilege asserted. For information or material withheld pursuant to any non-privilege objection, Living Essentials shall state that information or material responsive to the request has been withheld, identify the information or material withheld, and identify the objection pursuant to which the information or materials is being withheld. In the event that Living Essentials withholds information or material for any reason other than privilege or other objection, Living Essentials shall state that information or material responsive to the request has been withheld, identify the information or material withheld, and identify the reason(s) such information or material has been withheld.[4]

107. On September 12, 2008, Living Essentials served its supplemental responses to CNL's document requests and provided a withholding log. The Genesis Printout was neither produced nor logged as having been withheld.

---

[4]Banowsky Dec. at Ex. 12, at p. 2-3.

108.    Eleven days after producing responsive documents to CNL and providing its withholding log, Henderson sent a written demand to Royal instructing Royal to destroy and remove from their electronic systems any and all things related to Living Essentials' "confidential information" which encompassed essentially all of Royal's records relating to Living Essentials.

109.    Brian King ("King"), Royal's CEO, certified Royal's compliance with the instruction to destroy evidence by signing and returning the letter to Henderson on September 29, 2008.  Henderson did not inform King that there was litigation pending between Living Essentials and CNL and King had no reason to suspect that such litigation was pending.  If Henderson had informed King of the pending litigation, King would have consulted Royal's lawyers before undertaking the company wide document destruction.

110.    However, in connection with the depositions of both Royal and King, both witnesses were served with subpoenas on March 27, 2009, compelling them to appear and produce documents.  On April 24, 2009, another of Living Essentials' attorneys of record herein, Michelle M. Wezner ("Wezner"), sent counsel for the witnesses a letter requesting that Royal not produce responsive documents in advance of the deposition and further requesting that Royal not produce *any* ESI.  Remarkably, Wezner then instructed Royal to *destroy* all ESI in its possession.  The letter states:

> . . .with respect to the document pertaining to the 5 Hour Energy® formula that Royal asserts it discovered on April 22, please note that this document contains highly sensitive trade secret information of Living Essentials.  As with the other documents that Royal is required to produce, *Living Essentials requests that this document **only** be produced at the scheduled deposition* (and **only** in hard copy, paper form) . . .

Further, because of the highly sensitive nature of this document, Living Essentials further requests that the following actions take place:

. . .

2.     Royal and Ice Miller to certify that each and every electronic copy of the document ***has been removed*** from all servers, workstations or other data storage media on which the document may have resided.

Royal produced no ESI at the deposition.

111.     Of all the documents in its possession, Royal returned only five documents to Living Essentials.  The balance of Royals's documents, clearly numbering in the tens of thousands, were destroyed in compliance with Henderson's destruction order.  The electronic and hard copy documents destroyed include: (1) all of the batch records for the approximately 100 million bottles of 5 Hour Energy produced by Royal including records relating to potentially adulterated and/or mislabeled products; (2) all records which related in any way to the CNL Formula; (3) all documents related to the manufacturing of 5 Hour Energy by Royal; (4) essentially all emails between Living Essentials and Royal; (5) communications with material suppliers; (6) production schedules; (7) all manufacturing protocols used by Royal; (8) all of Royal's finished product testing results; and (9) essentially all communications between Royal and Living Essentials.

112.     Among the five documents returned to Living Essentials by Royal on September 29, 2008, is the Genesis Printout.

113.     The foregoing conduct constitutes at least four distinct violations of 18 U.S.C. 1503: (1) the intimidation of Morse; (2) the intimidation of Zwierzchowski; (3) the instructions from Henderson for Royal to destroy relevant documents during the pendency of this and the State Court Action; and (4) the instructions by Wezner that Royal destroy ESI.

DEFENDANTS' FIRST AMENDED COUNTERCLAIM - Page 41

114.    More specifically, Henderson, McCarthy and Wezner were all acting in their capacity as representatives of Living Essentials and corruptly or by threatening letter or communication, attempted to and have influenced, obstructed, or impeded, or endeavored to influence, obstruct, or impede, the due administration of justice in violation of 18 U.S.C. § 1503.

## V.  CAUSES OF ACTION

**A.**    <u>**Count One - UCC Sale of Goods**</u>.

115.    Defendants incorporate the preceding paragraphs herein.

116.    From time to time, Living Essentials issued purchase orders to CNL for the purchase of the Product.

117.    Those purchase orders were filled, shipped and invoiced by CNL.

118.    Living Essentials accepted the Product shipped to it by CNL pursuant to the Purchase Order.

119.    Living Essentials has made no complaint about the Product it received pursuant to the Purchase Order.

120.    Living Essentials has no justification or excuse for its failure to pay the invoices related to the Product delivered pursuant to the Purchase Order.

121.    Implied in the relationship between CNL and Living Essentials is a duty of good faith and fair dealing.

122.    On or about June 8, 2007, Living Essentials issued the Purchase Order to CNL for the manufacture of 7,000,000 bottles of the Product.

123.    CNL manufactured Product, pursuant to the Purchase Order, and shipped the Product to Living Essentials, which it accepted.

124.    Although Living Essentials has been invoiced for such Product, it continues to fail and refuse to pay such invoices.

125.    Living Essentials' conduct constitutes the breach of its contract to purchase goods from CNL as evidenced by the Purchase Order and related invoices.

126.    Living Essentials' conduct also constitutes an anticipatory repudiation of the remaining unfilled portion of the Purchase Order and Manufacturing Agreement.

127.    Accordingly, CNL was entitled to and has suspended its further performance thereof pursuant to the applicable UCC provisions.

128.    Living Essentials' conduct also constitutes a breach of its duty of good faith and fair dealing towards CNL.

129.    CNL seeks recover of the contract price for such goods or other available damages pursuant to Article II of the Uniform Commercial Code.  Additionally, CNL is entitled to recover its attorneys' fees and costs associated with collecting the unpaid invoices.

**B.    <u>Count Two - Breach of Contract</u>.**

130.    Defendants incorporate the preceding paragraphs herein.

131.    Living Essentials entered into the Manufacturing Agreement with CNL.

132.    Michigan law implies into every contract a duty of good faith and fair dealing.

133.    Implied in the Manufacturing Agreement is a duty of good faith and fair dealing.

134.    The Manufacturing Agreement required Living Essentials to purchase, at a minimum, 1,500,000 bottles of the Product per calender quarter.

135.    Living Essentials has failed to purchase, at a minimum, 1,500,000 bottles of the Product per calender quarter.

136.    Living Essentials' conduct constitutes a breach of the Manufacturing Agreement.

137.    Such breaches include, without limitation:

a.    Failing to pay for Product ordered by Living Essentials;

b.    Failing to order or pay for the minimum quantities of Product;

c.    Purporting to terminate the Manufacturing Agreement without providing CNL with written notice of breach, 30 days to cure, and written notice of termination; and

d.    Failing to pay CNL for raw materials acquired by CNL on behalf of Living Essentials.

138.    Living Essentials' conduct also constitutes a breach of its duty of good faith and fair dealing towards CNL.

139.    The Purchase Order, along with CNL's Standard Terms and Conditions and invoices, constitute a contract between the parties.

140.    Living Essentials has failed and refused to pay CNL's invoices for product delivered to it pursuant to the Purchase Order.

141.    Living Essentials' conduct constitutes a breach of the contract evidenced by the Purchase Order and the invoices related thereto.

142.    The Confidentiality Agreement is a contract between Living Essentials and CNL.

143.    Implied in the Confidentiality Agreement is a duty of good faith and fair dealing.

144.    Living Essentials breached the Confidentiality Agreement by, among other things, (1) disclosing the CNL Formula, or a derivative thereof, to other manufacturers; (2) disclosing the Genesis Printout to other manufacturers; (3) disclosing the Product Specifications to other manufacturers; (4)  disclosing the Manufacturing Processes to another manufacturer; (5) purporting to assign the CNL Formula to Bio Clinical; (6) using unflavored "base" provided by

CNL to "knock off" CNL's proprietary flavor; (7) disclosing the CNL Formula, or a derivative thereof, in one or more patent applications, and (8) using the CNL Formula, or a derivative thereof, the Genesis Printout, the Product Specifications, the unflavored "base" and/or CNL's Manufacturing Processes to reverse engineer, modify and/or manufacture the Product itself and with Royal and Liquid.

145. CNL's Standard Terms and Conditions were expressly incorporated into the Manufacturing Agreement.

146. Living Essentials breached CNL's Standard Terms and Conditions by, among other things, (1) disclosing the CNL Formula, or a derivative thereof, to other manufacturers; (2) disclosing the Genesis Printout to other manufacturers; (3) disclosing the Product Specifications to other manufacturers; (4)  disclosing the Manufacturing Processes to another manufacturer; (5) purporting to assign the CNL Formula to Bio Clinical; (6) using unflavored "base" provided by CNL to "knock off" CNL's proprietary flavor; (7) disclosing the CNL Formula, or a derivative thereof, in one or more patent applications, and (8) using the CNL Formula, or a derivative thereof, the Genesis Printout, the Product Specifications, the unflavored "base" and/or CNL's Manufacturing Processes to reverse engineer, modify and/or manufacture the Product itself and with Royal and Liquid.

147. As a result of Living Essentials' breaches of contract, CNL has been damaged in an amount which exceeds the minimum jurisdictional limits of this Court.  Additionally, CNL seeks to recover its attorneys' fees and costs as a result of these breaches.  CNL has presented its claims to Living Essentials and payment for the just amount owed has not been tendered for more than 30 days after the claim was presented.

148.    Further, Living Essentials' conduct constitutes an anticipatory repudiation of the Purchase Order and the Manufacturing Agreement.  Accordingly, CNL was entitled to and has suspended its further performance thereof pursuant to state law.

**C.    Count Three - Fraud.**

149.    Defendants incorporate the preceding paragraphs herein.

150.    As set forth more fully above, Living Essentials, through Bjargava and Henderson, made untrue representations of material fact to CNL.  At the time such representations were made, Bhargava and Henderson knew or should have known that they were untrue or was reckless as to the truth of the statements.

151.    Additionally, CNL and Living Essentials entered into a confidential relationship.

152.    Living Essentials owed CNL a duty of good faith and fair dealing.

153.    Living Essentials had an affirmative duty to disclose to CNL facts relevant to the relationship between the parties.  Nevertheless, Living Essentials failed to disclose, and actively hid from CNL, at least the following: (1) the fact that it was planning on terminating its relationship with CNL; (2) the fact that it was attempting to knock off CNL's proprietary flavor; (3) the fact that it was in the process of setting up additional manufacturers; (4) the fact that it had disclosed the CNL Formula to other manufacturers; (5) the fact that it disclosed the Manufacturing Processes to other manufacturers; and (6) the fact that it intended to establish its own manufacturing capacity after Bhargava had represented that it would never manufacture its own products.

154.    The false statements and failures to disclose were made by Living Essentials' employees and officers, were made in the actual course and scope of the duties of such

employees and officers and each was expressly authorized to make such false statements and to withhold such disclosures. Such false statements and failures to disclose, as set forth in the factual recitations above, were made to, inter alia, induce CNL to (1) disclose the CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes, (2) provide Living Essentials with unflavored "base" of the Product; (3) enter into a lease of a new expanded manufacturing facility at greatly increased cost; and (4) enter into the Manufacturing Agreement.

155.    In reasonable reliance upon the false statements and representations, CNL, inter alia, (1) disclosed the CNL Formula, the Genesis Printout, the Product Specifications and Manufacturing Processes and knowledge to Living Essentials, (2) provided Living Essentials with unflavored "base" of the Product; (3) entered into a lease of a new expanded manufacturing facility at greatly increased cost; and (4) entered into the Manufacturing Agreement.

156.    As a direct and proximate result of Living Essentials' conduct, CNL has suffered damages within this Court's jurisdictional limits.

157.    The acts and conduct of Living Essentials were intentional, willful, wanton, and malicious, and were without justification or excuse. Accordingly, CNL is entitled to recover punitive damages from Living Essentials in an amount to be determined by the jury.

**D.    Count Four - Tortious Interference.**

158.    Defendants incorporate the preceding paragraphs herein.

159.    CNL has developed and is continuing to develop business relationships with current and prospective marketers of nutritional supplements. As set forth above, Living Essentials has interfered with those actual and prospective contractual relationships by, among other conduct, issuing the Legal Notice.

160.    Living Essentials' conduct as set forth above constitutes a tortious interference with CNL's actual and/or prospective business relationships.  As a proximate cause of such conduct, CNL has suffered damages within this Court's jurisdictional limits.

161.    Living Essentials engaged in the above conduct willfully, wantonly, or with conscious indifference to the rights of CNL.  Accordingly, CNL seeks punitive damages in an amount to be determined by the jury.

**E.    Count Five - Theft.**

162.    Defendants incorporate the preceding paragraphs herein.

163.    Living Essentials committed the theft and or misappropriation of trade secrets owned by CNL, at common law, and pursuant to Tex. Penal Code §31.05.  Living Essentials is therefore liable to CNL at common law and pursuant to Tex. Civ. Prac. & Rem. Code §134.001, et seq.  More specifically, Living Essentials, without CNL's effective consent, (1) stole the CNL Formula, the Genesis Printout, the Product Specifications and the Manufacturing Processes which are CNL trade secrets; (2) made a copy of the CNL Formula, the Genesis Printout, the Product Specifications and/or the Manufacturing Processes which are CNL trade secrets; and/or (3) communicated or transmitted the CNL Formula, the Genesis Printout, the Product Specifications and/or the Manufacturing Processes which are CNL trade secrets.

164.    The conduct of Living Essentials was malicious.  Accordingly, CNL seeks to recover punitive damages in an amount to be determined by the jury.

165.    CNL also seek to recover its attorneys' fees and costs pursuant to Tex. Civ. Prac. & Rem. Code §134.005.

F.    **Count Six - Michigan Misappropriation of Trade Secrets.**

166.    Defendants incorporate the preceding paragraphs herein.

167.    The CNL Formula is a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

168.    The CNL Formula is the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

169.    The Genesis Printout is a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

170.    The Genesis Printout is the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

171.    The Product Specifications are formulas, patterns, compilations, programs, devices, methods, techniques, or processes, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

172.    The Product Specifications are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

173.    The Manufacturing Processes are formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential,

from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

174. The Manufacturing Processes are the subject of efforts that are reasonable under the circumstances to maintain their secrecy.

175. Living Essentials acquired the CNL Formula by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means.

176. Living Essentials acquired the Genesis Printout by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means.

177. Living Essentials acquired the Product Specifications by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means.

178. Living Essentials acquired the Manufacturing Processes by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means.

179. The CNL Formula was disclosed by Living Essentials who acquired knowledge of the CNL Formula and by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means and/or knew or had reason to know that knowledge of the trade secret was derived from or through a person who had utilized theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means to acquire it, acquired

under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use and/or before a material change of its position, knew or had reason to know that the CNL Formula was a trade secret and that knowledge of it had been acquired by accident or mistake.

180.    The Genesis Printout was disclosed by Living Essentials who acquired knowledge of the Genesis Printout by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means and/or knew or had reason to know that knowledge of the trade secret was derived from or through a person who had utilized theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use and/or before a material change of its position, knew or had reason to know that the Genesis Printout was a trade secret and that knowledge of it had been acquired by accident or mistake.

181.    The Product Specifications were disclosed by Living Essentials who acquired knowledge of the Product Specifications by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means and/or knew or had reason to know that knowledge of the trade secret was derived from or through a person who had utilized theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to

maintain its secrecy or limit its use and/or before a material change of its position, knew or had reason to know that the Product Specifications were a trade secret and that knowledge of it had been acquired by accident or mistake.

182.    The Manufacturing Processes were disclosed by Living Essentials who acquired knowledge of the Manufacturing Processes by theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means and/or knew or had reason to know that knowledge of the trade secret was derived from or through a person who had utilized theft, bribery, misrepresentation, breach, or inducement of a breach of a duty to maintain secrecy or espionage through electronic or any other means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use and/or before a material change of its position, knew or had reason to know that the Manufacturing Processes were trade secrets and that knowledge of them had been acquired by accident or mistake.

183.    Pursuant to MCL § 445.1904, CNL is entitled to recover (1) its actual loss caused by misappropriation; (2) the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss; or (3) in lieu of damages measured by any other methods, a reasonable royalty for Living Essentials' unauthorized use and/or disclosure of the CNL Formula and/or Manufacturing Processes.

## G.    Count Seven - State Law Unfair Competition

184.    Defendants incorporate the preceding paragraphs herein.

185.    The conduct described above was engaged in by Living Essentials for purposes of driving CNL out of business.  Specifically, Living Essentials is attempting to monopolize the energy shot market, in which Living Essentials is the dominant player, and to restrain trade and competition by driving CNL, a highly competent private label manufacturer, out of the energy shot market.

186.    The conduct described herein constitutes common law unfair competition and also violates the provisions of Tex. Bus. & Comm. Code § 15.01, et seq.

187.    As a result of the foregoing, CNL has suffered damages in excess of $75,000.00, exclusive of interests and costs, which it seeks to recover from Living Essentials.  Additionally, all such conduct was willful and/or flagrant.  Accordingly, CNL is entitled to a treble damage award.

188.    CNL also seek to recover its attorneys' fees and costs.

**H.    Count Eight - Sherman Act Violations - Monopolization.**

189.    Defendants incorporates the preceding paragraphs herein.

190.    This is a civil action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for treble damages, the costs of suit, and a reasonable attorney's fee pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

191.    Upon information and belief, Living Essentials has monopolized a part of the trade or commerce among the several states. Upon information and belief Living Essentials possesses a monopoly power in the relevant market and has engaged in the willful acquisition or maintenance of that power.

192.    Living Essentials,  CNL and Ultimate Lifestyles are competitors in the distribution and sale of dietary and nutritional supplements within the United States.  Ultimate Lifestyles utilizes the identical or similar channels of wholesale and retail distribution of its supplement products as does Living Essentials.

193.    Likewise, CNL sells its finished products to companies that utilize the identical or similar channels of wholesale and retail distribution of their supplement products as does Living Essentials.

194.    Living Essentials represented to the USPTO, in its efforts to register the product name "5 Hour Energy" on the Principal Trademark Register, that it controls 76% of the energy shot market in the United States and identifies 27 other competing "energy shot" brands.[5]  Living Essentials represented to the USPTO that its sales are three times the combined sales of all its competitors in the "energy shot category" which it alleges it created.  The energy shot market (the "Energy Shot Market") is a market which is independent and distinct from the market for energy drinks.  The Energy Shot Market is also independent and distinct from the market for other supplement shots, such as those intended to enhance libido.  Energy shots are nutritional supplements designed to enhance alertness and reduce mental fatigue.  Energy shots are typically stored and consumed at room temperature and are packaged in shot size packing.  CNL and Ultimate Lifestyles believe that Living Essentials' 76% domination of the Energy Shot Market constitutes a monopoly.

---

[5]A true and correct copy of Living Essentials' recent response to the USPTO's office action, without exhibits, is attached hereto as Exhibit A and incorporated herein by this reference.

DEFENDANTS' FIRST AMENDED COUNTERCLAIM - Page 54

195.    Supplement products sold in the Energy Shot Market command a substantial price premium over supplement products sold in other sizes, at least in part due to the fact that larger sizes are sold and consumed as beverages, and products in the Energy Shot Market are not sold and consumed as beverages.

196.    The Energy Shot Market constitutes a relevant economic market for purposes of antitrust analysis.  Further, products sold in the Energy Shot Market are reasonably interchangeable in that one product in the Energy Shot Market is roughly equivalenet to another for the use to which it is put.  While there may be some degree of preference for the one over the other, either would work effectively.  Further, the products in the Energy Shot Market are characterized by a cross-elasticity of demand.  The rise in the price of a good within the Energy Shot Market tends to create a greater demand for other like goods in the market.

197.    The United States of America constitutes a relevant geographic market for purposes of antitrust analysis, and there may also be smaller regions within the United States that also constitute relevant geographic markets for Energy Shots.

198.    By virtue of its monopolistic 76% share of the Energy Shot Market, Living Essentials possesses market power.

199.    Living Essentials has represented to the USPTO that its sales of products in the Energy Shot Market have exceeded 230 million units since 2004 and in excess of 130 million units in the nine months ending March 2009.[6]

---

[6]A true and correct copy of the Declaration of Scott Henderson is attached hereto as Exhibit B and incorporated herein by this reference..

200.    Living Essentials has taken a variety of anticompetitive actions and steps to try to illegally prevent CNL and others from competing with Living Essentials' lucrative monopoly in the Energy Shot Market.  Each of these anti-competitive actions has had a substantial effect on interstate commerce as Living Essentials sells its products in the Energy Shot Market in all 50 of the United States of America and its anti-competitive conduct is engaged in across the boundaries of all 50 states.  Such anti-competitive conduct includes, without limitation, the following:

    a.    Living Essentials has wielded its weak and non-distinctive "5 HOUR ENERGY" trademark as a sword against several competitors in the Energy Shot Market, including NVE, N2G, BDI and CNL, even though Living Essentials knows that its registration on the Supplemental Register of the United States Patent and Trademark Office ("USPTO") indicates that the mark is weak and unenforceable and the registration was procured by fraud;

    b.    In connection with a Preliminary Injunction motion in a case styled Living Essentials v. N2G, Civil No. 08-10983-PDB, Judge Borman granted the requested injunction on trade dress grounds, but refused to grant the injunction on the grounds of infringement of the "5 HOUR ENERGY" trademark due to the lack of distinctiveness of that mark, even though the competing and allegedly infringing mark was "6 HOUR ENERGY";

    c.    Notwithstanding the Court's refusal to grant an injunction on trademark grounds, Living Essentials took out a full page ad in the trade press read by wholesale purchasers in the Energy Shot Market that falsely and improperly suggested that it was a "Legal Notice" and that suggested that the Court had enjoined the sale of all energy shots sold under a trademark including the words "6 HOUR", in the process deliberately omitting the name of the defendant enjoined by the Court, even though Living Essentials is aware that others market and sell energy shots under a "6 HOUR" mark and CNL manufactured the BDI Product which includes the phrase "6 Hour Energy;"

    d.    Living Essentials' illegal practices have harmed the competitive environment in the Energy Shot Market, and other competitors in this market have also objected to and moved to enjoin Living Essentials' false and misleading statements;

    e.    Living Essentials directly contacted existing customers for CNL's products, including the BDI Product, and including critical distributors to and in the retail

channels in which the nutritional and dietary supplements of both Living Essentials and CNL are sold using the "Legal Notice" and caused the wholesale and retail distributors to cancel existing contracts and refuse to restock the BDI Product and, on information and belief, the energy shot products of Innovations Venture's other competitors, including but not limited to NVE;

f.    Living Essentials improperly obtained the 6 HOUR POWER Domains at a time when it possessed, or was dangerously close to possessing, monopoly control of the Energy Shot Market and when it knew that 6 HOUR POWER was the mark under which its competitor NVE was promoting and selling its competing products;

g.    Living Essentials engaged in exclusionary conduct with distributors of CNL's and other competitors' products, including the BDI Product, in order to stifle and restrict competition by coercing and offering incentives to distributors of its competitors' products, including the BDI Product, to stop selling those products. Living Essentials illegal and anti-competitive conduct is illustrated in a recently filed lawsuit by one of its biggest distributors, CB Distributors, Inc.[7]

h.    Living Essentials coerced CNL into entering into the Manufacturing Agreement in order to secure from CNL an agreement not to compete with Living Essentials. The agreement not to compete does not address any legitimate business interest of Living Essentials.  Rather, the non-compete agreement was obtained by Living Essentials for the sole purpose of restricting competition in the Energy Shot Market.

201.    Upon information and belief, Living Essentials' illegal course of conduct and each of these actions was undertaken in an attempt to stifle and restrict competition in the Energy Shot Market, and to increase the costs of participation in that market by imposing unwarranted legal costs and expenses upon its competitors, and to discourage other competitors from entering that market in the first place.

202.    Upon information and belief, Living Essentials has taken each of these steps, and perhaps others not yet discovered, to illegally restrict the participation of its competitors in the

---

[7]A true and correct copy of the CB Complaint is attached hereto as Exhibit C and the factual allegations therein are incorporated herein by this reference.

Energy Shot Market and to maintain its monopoly position, high prices, and significant profit margins and otherwise to continue to dominate the Energy Shot Market.

203.    Upon information and belief, Living Essentials' acts to improperly enforce its weak or non-existent trademark rights through litigation, have restricted entry into the U.S. market and protected Living Essentials' dominant share of the relevant market from encroachment.

204.    Living Essentials' conduct in attempting to prevent CNL from manufacturing competing products in the Energy Shot Market and other anti-competitive actions have damaged CNL, Living Essential's other competitors and wholesale and retail customers.  Upon information and belief, were it not for Living Essentials' acts, wholesale and retail customers in the United States would have multiple sources of relevant product widely distributed at competitive prices, leading to increased output and lower prices ultimately to the benefit of consumers.

205.    Upon information and belief, the purpose and effect of Living Essentials' actions was to block competition from entering the relevant market. Its actions are not justified by any countervailing efficiencies or legitimate business reasons.

206.    Upon information and belief, in addition to harming its actual and current competitors such as CNL, Living Essentials has also harmed competition in the Energy Shot Market in a manner offensive to and prohibited by the antitrust laws.

207.    CNL and Ultimate Lifestyles have been damaged by the illegal and anti-competitive actions of Living Essentials through the loss of sales and market share and, pursuant

to 15 U.S.C. § 15, seek to recover three times the amount of their actual damages, plus reasonable attorneys' fees and costs of suit.

**I.**     **Count Nine - Sherman Act Violations - Attempted Monopolization.**

208.    Defendants incorporate the preceding paragraphs herein.

209.    This is a civil action under Section 2 of the Sherman Act, 15 U.S.C. § 2, for treble damages, the costs of suit, and reasonable attorney's fees pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

210.    By virtue of its large nationwide market share and its wrongful attempts to enforce its trademarks and other anti-competitive acts, Living Essentials has the ability to attempt to control the United States Energy Shot Market.

211.    Living Essentials' actions as set forth herein evidence a specific intent to monopolize and/or to destroy competition in the Energy Shot Market in the United States.

212.    Living Essentials has willfully engaged in a course of predatory and/or exclusionary conduct in order to obtain a monopoly in the Energy Shot Market in the United States.

213.    Living Essentials' illegal course of anticompetitive conduct and each action in furtherance thereof was taken for the purpose of obtaining a monopoly in the relevant economic and geographic markets described above.

214.    Unless restrained and prevented by this Court, Living Essentials' illegal course of anti-competitive conduct and each action in furtherance thereof has a dangerous probability of succeeding in obtaining a monopoly in the relevant economic and geographic markets described above.

215.    Because Living Essentials' clearly exclusionary conduct, lacking any legitimate business purpose, along with the exclusionary intent that can be inferred from such conduct, poses such a danger to competition, it may be condemned even without a showing of a dangerous probability of success.

216.    If Living Essentials succeeds in obtaining a monopoly in the relevant economic and geographic markets described above, these acts will harm and restrain competition in the relevant markets and cause antitrust injury as prohibited by the antitrust laws of the United States.

217.    CNL and Ultimate Lifestyles have been damaged by the illegal and anticompetitive actions of Living Essentials through the loss of sales and market share and, pursuant to 15 U.S.C. § 15, seek to recover three times the amount of their actual damages, plus reasonable attorneys' fees and costs of suit.

**J.**    **Count Ten -False Designation of Origin of Products, False Advertising And False Description and Representation.**

218.    Defendants incorporate the preceding paragraphs herein.

219.    This cause of action arises under Section 43(a) of the Trademark Act of 1946 as amended, 15 U.S.C. § 1125(a), for false designation of the origin of products, false description and representation, and false advertising.

220.    By reason of the foregoing acts, Living Essentials has falsely suggested in national advertising to the consuming public that a broad array of products are subject to a court ordered recall when that is untrue. Living Essentials' activities are likely to create confusion among the purchasing public, are likely to deceive purchasers concerning the affiliation, connection or association of CNL and its products, with the person and products enjoined by the

Federal court, and will otherwise mislead purchasers as to the source, origin or affiliation of the products referred to by Living Essentials.

221.    By reason of the foregoing acts, Living Essentials has falsely suggested in national advertising to the consuming public that a broad array of products are subject to a court ordered recall when that is untrue. Living Essentials' commercial advertising or promotion, misrepresents the nature, characteristics, qualities or origin of CNL's foods, services, or commercial activities.

222.    By reason of the foregoing acts, Living Essentials has falsely represented in national advertising to the consuming public that the Product is the original 2 ounce energy shot when, in fact, Shotsz is the original 2 ounce energy shot. Living Essentials' commercial advertising or promotion, misrepresents the nature, characteristics, qualities or origin of CNL's foods, services, or commercial activities.

223.    Living Essentials' misleading "Legal Notice" and false advertising flyers constitute false advertising, presents false or misleading descriptions of fact, or false or misleading representation of fact, and affects interstate commerce.

224.    CNL has been and will continue to be injured by Living Essentials' false and/or misleading statements.

225.    Living Essentials' false and/or misleading statements violate the Lanham Act, 15 U.S.C. § 1125.

226.    CNL is irreparably harmed, has no adequate remedy at law and is entitled to injunctive relief.

227.    Living Essentials' intentional and willful violations entitle CNL to recover three times its actual damages in an amount to be determined at trial pursuant to 15 U.S.C. § 1117.

228.    Living Essentials' intentional and willful violations entitle CNL to recover its reasonable attorneys' fees in amount to be determined at trial pursuant to 15 U.S.C. § 1117.

**K.**    **Count Eleven - Cancellation of Supplemental Registration.**

229.    Defendants incorporate the preceding paragraphs herein.

230.    As set forth above, Living Essentials has obtained a registration for the product name "5 Hour Energy" on the Trademark Supplemental Register.  However, the product name "5 Hour Energy" is, in reality, generic of a product genus as the product name simply communicates functional information about the product genus, that it provides energy for 5 hours, and similar product names have been widely utilized by a number of independent third parties thereby denying Living Essentials substantial exclusivity of the product name.

231.    Additionally, as set forth above, the license from Bio Clinical to Living Essentials is a non-exclusive "naked license," i.e., it includes no quality control provisions, and thereby results in the abandonment of any rights which may have existed in the product name.

232.    Further, Living Essentials obtained the registration by fraud.  More specifically, Living Essentials represented to the USPTO in its declaration to allege use that it was using the product name "5 Hour Energy" in connection with  "homeopathic supplements, pharmaceutical preparations, nutritional supplements and dietary supplements that relieve or prevent fatigue." As a result, the USPTO relied on Living Essentials' representations and registered the product name "5 Hour Energy" on the Supplemental Trademark Register in connection with either homeopathic supplements or pharmaceutical preparations."  In fact, Living Essentials has never

used the product name "5 Hour Energy" in connection with either homeopathic supplements or pharmaceutical preparations.

233.    Accordingly, pursuant to 15 U.S.C. § 1092, Defendants seek an order cancelling the registration of the product name "5 Hour Energy" on the Supplemental Register.

**L.    Count Twelve - Declaratory Relief as to Trademark.**

234.    Defendants incorporate the preceding paragraphs herein.

235.    An actual controversy exits under the Lanham Act between Defendants and Living Essentials.

236.    Living Essentials alleges that it is the owner of U.S. Trademark Registration No. 3,003,077 (the `077 Registration) on the Supplemental Register of the United States Patent & Trademark Office for the highly descriptive, if not generic, phrase "5 hour energy."

237.    Living Essentials alleges that Defendants have infringed or otherwise unfairly competed with Living Essentials through the use of the highly descriptive, if not generic, phrase "6 Hour Energy!".

238.    Defendants allege that Living Essentials' alleged trademark is highly descriptive, if not generic, and therefore cannot function as a trademark or source identifier. In particular, both of the phrases at issue are used to describe a characteristic, function, feature, purpose or use of the respective energy boosting products.

239.    Various other third party entities use descriptive phrases similar to the highly descriptive phrases set forth above to describe their respective energy boosting products.

240.    Defendants are entitled to a declaratory judgment that the phrase "5 hour energy" is merely descriptive of Living Essentials' energy boosting product, if not generic of the entire

genus, and therefore is not capable of functioning as a trademark or source identifier and that the `077 Registration is invalid and unenforceable.

241.    Moreover, Living Essentials has dismissed its claims against BDI with prejudice. CNL is in privity with BDI as it manufactured the BDI product which was the subject of the litigation between BDI and Living Essentials.  Jones and Ultimate Lifestyles are likewise in privity with CNL and Norwood is in privity with Ultimate Lifestyles.  Defendants are entitled to a declaratory judgment that the dismissal of the claims in the BDI lawsuit bars all claims asserted against defendants herein arising out of or related to the same nucleolus of operative facts pursuant to the doctrines of *res judicata* and/or collateral estoppel.  Such claims include, without limitation, all alleged trademark, trade dress and unfair competition claims and all claims related to the manufacture of the BDI Product, including without limitation, claims that CNL has breached the non-compete provisions of the Manufacturing Agreement.

242.    Likewise, Defendants are entitled to a declaratory judgment that Living Essentials possesses no common law rights in and to the product name "5 Hour Energy" and the trade dress associated with the Product because the product name has not acquired secondary meaning, living Essentials is not the owner of the rights to the product name and associated trade dress, and any rights which might have existed thereunder have been abandoned as a result of the naked license between Living Essentials and Bio Clinical.

**M.**    **Count Thirteen - Declaratory Relief Regarding Copyright Registration.**

243.    Defendants incorporate the preceding paragraphs herein.

244.    An actual controversy exits under the Copyright Act between Defendants and Living Essentials.

245.    Living Essentials is the registrant of U.S. Copyright Registration No. TX0006833514 for the text of the cautionary warning on the label of the Product.

246.    However, one or more employees of CNL were, in large part, the authors of the caution label. The creation of the caution label was not a work for hire by CNL.  Accordingly, to the extent that the cautionary label is properly the subject of a copyright registration, CNL is a co-author and/or co-owner of such copyright.  As such, Defenants cannot be held liable for its alleged infringement.

**N.     Count Fourteen - Declaratory Relief as to Non Compete Agreement.**

247.    Defendants incorporate the preceding paragraphs herein.

248.    An actual controversy exits under between CNL and Living Essentials.

249.    CNL seeks a declaratory judgment declaring that the non-compete provision of the Manufacturing Agreement is an unreasonable restraint on trade, that enforcement of the provision would violate the laws and public policy of the the United States of America and the states of Texas and/or Michigan, and that the non-compete provisions are therefore null and void.

250.    Additionally, Defendants seek a declaratory judgment that any alleged consideration for the non-compete agreement has failed, in whole or in part, thereby rendering the non-compete agreement unenforceable.

251.    Additionally, Defendants seek a declaratory judgment that the non-compete agreement was procured by fraud, thereby rendering the non-compete agreement unenforceable.

**O.     Count Fifteen - Civil RICO Violations Section 1962(c).**

252.    Defendants incorporate the preceding paragraphs herein.

253.    Both Royal and Liquid are enterprises engaged in and whose activities affect interstate commerce.

254.    As set forth more fully above, Living Essentials agreed to and did conduct and participate in the conduct of the enterprises' affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding CNL, misappropriating CNL's trade secrets and driving CNL out of business.

255.    Pursuant to and in furtherance of its fraudulent scheme, Living Essentials committed multiple related acts of racketeering.  From at least 2004 to the present, Living Essentials committed numerous and repeated acts indictable under 18 U.S.C. §§ 1503, 131341, 1343, 1512, 1832 and 2314, each of which constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), and all of which collectively constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), including, without limitation, the following:

    a.    The theft of the CNL Formula in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    b.    The theft of the Genesis Printout in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    c.    The theft of the Product Specifications in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    d.    The theft of the Manufacturing Processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    e.    The illegal copying of the CNL Formula, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

    f.    The illegal copying of the Genesis Printout, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

g.     The illegal copying of the Product Specifications, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

h.     The illegal copying of Manufacturing Processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

i.     The illegal trafficking in, transportation of, communication or transmission of the CNL Formula, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

j.     The illegal trafficking in, transportation of, communication or transmission of the Genesis Printout, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

k.     The illegal trafficking in, transportation of, communication or transmission of the Product Specifications, or a derivative thereof, to a third party in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

l.     The illegal trafficking in, transportation of, communication or transmission of CNL's manufacturing knowledge and/or processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

m.     The monopolization or attempted to monopolization the Energy Shot market in violation of the Sherman Anti-Trust Act by virtue of the anti-competitive activities set forth above;

n.     Mail fraud in connection with the Legal Notice in violation of 18 U.S.C. §1341;

o.     Wire fraud in connection with Living Essential's fraudulent activities related to CNL in violation of 18 U.S.C. §1343;

p.     Witness tampering and obstruction of justice in connection with its threats against Tom Morse and Kevin Zwierzchowski in violation of 18 U.S.C. §§ 1503 and 1512;

q.     Obstruction of justice in connection with instructions to Royal to destroy documents and ESI during the pendency of this litigation in violation of 18 U.S.C. § 1503.

r.     Extortion to coerce CNL into entering into the 2007 Agreement;

s.      The purported assignment of all the rights in and to the intellectual property associated with the Product, including the stolen CNL Formula, to the Bio Clinical in violation of 18 U.S.C. §§ 1832 and 2314; and

t.      The communication or transmission of the CNL Formula, or a derivative thereof, to a third party in violation of Texas Penal Code §31.05 and 18 U.S.C. §§ 1832 and 2314 by applying for a patent in which the CNL Formula, or a derivative thereof, is set forth.

256.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

257.    Living Essentials has directly and indirectly conducted and participated in the conduct of the enterprises' affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

258.    As a direct and proximate result of Living Essentials' racketeering activities and violations of 18 U.S.C. § 1962 (c), CNL has been injured in its business and property in that it has lost the sales of hundreds of millions of bottles of the Product which have been produced by Living Essentials, Royal and Liquid and which continue to be produced, by Living Essentials and Liquid.  Additionally, Bio Clinical has disclosed the CNL Formula in one or more pending patent applications which will result in the publication of the CNL Formula, or a derivative thereof, which will negatively impact the value of the CNL Formula as a trade secret.

**P.      Count Sixteen - Civil RICO Violations Section 1962(a).**

259.    Defendants incorporate the preceding paragraphs herein.

260.    Both Royal and Liquid are enterprises engaged in and whose activities affect interstate commerce.

261.    Living Essentials used and invested income that was derived from a pattern of Racketeering activity in one or more interstate enterprises.  More specifically, Living Essentials

entered into an agreement with Royal whereby Living Essentials would pay for a new liquid

production line to be installed in Royal's facilities.  Pursuant to the agreement, a portion of the

sales price of every bottle of the Product manufactured by Royal was allocated to the payment of

the purchase price on such equipment.  Once the equipment was paid for by Living Essentials,

the contract price was reduced thereafter to eliminate the continuing investment.  Upon

information and belief, Living Essentials agreement with Liquid included a similar investment

provision.  The income that Living Essentials invested in both Royal and Liquid was derived

from a pattern of racketeering activities.  In this regard, Living Essentials committed multiple

related acts of racketeering.  From at least 2004 to the present, Living Essentials committed

numerous and repeated acts indictable under 18 U.S.C. §§ 1503, 131341, 1343, 1512, 1832 and

2314, each of which constitutes "racketeering activity" within the meaning of 18 U.S.C. §

1961(1), and all of which collectively constitute a "pattern of racketeering activity" within the

meaning of 18 U.S.C. § 1961(5), including, without limitation, the following:

    a.    The theft of the CNL Formula in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    b.    The theft of the Genesis Printout in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    c.    The theft of the Product Specifications in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    d.    The theft of the Manufacturing Processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

    e.    The illegal copying of the CNL Formula, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

    f.    The illegal copying of the Genesis Printout, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

g.    The illegal copying of the Product Specifications, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

h.    The illegal copying of Manufacturing Processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

i.    The illegal trafficking in, transportation of, communication or transmission of the CNL Formula, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

j.    The illegal trafficking in, transportation of, communication or transmission of the Genesis Printout, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

k.    The illegal trafficking in, transportation of, communication or transmission of the Product Specifications, or a derivative thereof, to a third party in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

l.    The illegal trafficking in, transportation of, communication or transmission of CNL's manufacturing knowledge and/or processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

m.    The monopolization or attempted to monopolization the Energy Shot market in violation of the Sherman Anti-Trust Act by virtue of the anti-competitive activities set forth above;

n.    Mail fraud in connection with the Legal Notice in violation of 18 U.S.C. §1341;

o.    Wire fraud in connection with Living Essential's fraudulent activities related to CNL in violation of 18 U.S.C. §1343;

p.    Witness tampering and obstruction of justice in connection with its threats against Tom Morse and Kevin Zwierzchowski in violation of 18 U.S.C. §§ 1503 and 1512;

q.    Obstruction of justice in connection with instructions to Royal to destroy documents and ESI during the pendency of this litigation in violation of 18 U.S.C. § 1503.

r.    Extortion to coerce CNL into entering into the 2007 Agreement;

s.    The purported assignment of all the rights in and to the intellectual property associated with the Product, including the stolen CNL Formula, to the Bio Clinical in violation of 18 U.S.C. §§ 1832 and 2314; and

t.      The communication or transmission of the CNL Formula, or a derivative thereof, to a third party in violation of Texas Penal Code §31.05 and 18 U.S.C. §§ 1832 and 2314 by applying for a patent in which the CNL Formula, or a derivative thereof, is set forth.

262.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

263.    As a direct and proximate result of Living Essentials' racketeering activities and violations of 18 U.S.C. § 1962 (a), CNL has been injured in its business and property in that it has lost the sales of tens of millions if not hundreds of millions of bottles of the Product which have been produced by Royal and Liquid and which continue to be produced, by Liquid, were produced on equipment paid for by Living Essentials investment of its racketeering income.

**Q.    Count Seventeen - Civil RICO Violations Section 1962(d).**

264.    Defendants incorporate the preceding paragraphs herein.

265.    As set forth above, both Living Essentials and Bio Clinical agreed and conspired to violate 18 U.S.C. §§ 1962 (a) and (c).  More specifically, From at least 2004 to the present, Living Essentials and Bio Clinical have committed numerous and repeated acts indictable under 18 U.S.C. §§ 1503, 131341, 1343, 1512, 1832 and 2314, each of which constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1), and all of which collectively constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5), including, without limitation, the following:

a.      The theft of the CNL Formula in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

b.      The theft of the Genesis Printout in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

c.      The theft of the Product Specifications in violation of Tex. Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

d.      The theft of the Manufacturing Processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §§ 1343 and 1832;

e.      The illegal copying of the CNL Formula, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

f.      The illegal copying of the Genesis Printout, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

g.      The illegal copying of the Product Specifications, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

h.      The illegal copying of Manufacturing Processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §1832;

i.      The illegal trafficking in, transportation of, communication or transmission of the CNL Formula, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

j.      The illegal trafficking in, transportation of, communication or transmission of the Genesis Printout, or a derivative thereof, in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

k.      The illegal trafficking in, transportation of, communication or transmission of the Product Specifications, or a derivative thereof, to a third party in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

l.      The illegal trafficking in, transportation of, communication or transmission of CNL's manufacturing knowledge and/or processes in violation of Texas Penal Code §31.05 and 18 U.S.C. §§1832 and 2314;

m.      The monopolization or attempted to monopolization the Energy Shot market in violation of the Sherman Anti-Trust Act by virtue of the anti-competitive activities set forth above;

n.      Mail fraud in connection with the Legal Notice in violation of 18 U.S.C. §1341;

o.      Wire fraud in connection with Living Essential's fraudulent activities related to CNL in violation of 18 U.S.C. §1343;

p.     Witness tampering and obstruction of justice in connection with its threats against Tom Morse and Kevin Zwierzchowski in violation of 18 U.S.C. §§ 1503 and 1512;

q.     Obstruction of justice in connection with instructions to Royal to destroy documents and ESI during the pendency of this litigation in violation of 18 U.S.C. § 1503.

r.     Extortion to coerce CNL into entering into the 2007 Agreement;

s.     The purported assignment of all the rights in and to the intellectual property associated with the Product, including the stolen CNL Formula, to the Bio Clinical in violation of 18 U.S.C. §§ 1832 and 2314;

t.     The communication or transmission of the CNL Formula, or a derivative thereof, to a third party in violation of Texas Penal Code §31.05 and 18 U.S.C. §§ 1832 and 2314 by applying for a patent in which the CNL Formula, or a derivative thereof, is set forth; and

u.     The investment into Royal and Liquid for the purpose of acquiring manufacturing lines used to manufacture the Product with the misappropriated CNL Formula, or a derivative thereof.

266.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

267.    Living Essentials and Bio Clinical have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in one or more interstate enterprises and conduct the affairs of the enterprises through a pattern of racketeering activity. Living Essentials and Bio Clinical knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a) and (c) in violation of 18 U.S.C. § 1962 (d).

268.    As a direct and proximate result of the conspiracy, the overt acts taken in furtherance of that conspiracy and the violations of 18 U.S.C. § 1962 (d), CNL has been injured

in its business and property in that it has lost the sales of hundreds of millions of bottles of the Product which have been produced by Living Essentials, Royal and Liquid and which continue to be produced, by Living Essentials and Liquid.  Additionally, Bio Clinical has disclosed the CNL Formula in one or more pending patent applications which will result in the publication of the CNL Formula, or a derivative thereof, which will negatively impact the value of the CNL Formula as a trade secret.

**R.    Count Eighteen - Further Injunctive Relief.**

269.    Defendants incorporate the preceding paragraphs herein.

270.    CNL requires a temporary restraining order and a preliminary and permanent injunction prohibiting Living Essentials from making cash or other monetary transfers or distributions to its members.  CNL requires this relief because Bhargava is causing Living Essentials to distribute essentially all its cash to its members in order to keep Living Essentials unable to respond to a money judgment and has, in fact, drained Living Essentials of nearly all its cash.  Living Essentials has no legitimate interest in distributing all its cash and is doing so simply to remain "lawsuit proof."

271.    Additionally, CNL requires a permanent injunction prohibiting Living Essentials, its employers, employees, agents, representatives, parents, subsidiaries, affiliates, attorneys, assigns and those persons in concert or participation with them from (1) disclosing the CNL Formula; (2) utilizing the CNL Formula; (3) utilizing a derivative of the CNL Formula; (4) disclosing the Genesis Printout; (5) utilizing the Genesis Printout; (6) utilizing a derivative of the Genesis Printout; (7) disclosing the Product Specifications; (8) utilizing the Product Specifications; (9) utilizing a derivative of the Product Specifications; (10) disclosing the

Manufacturing Processes; (11) utilizing the Manufacturing Processes; (12) manufacturing or

contracting for the manufacture of the Product; or (13) selling the Product.

272.    CNL requires this relief because it owns the CNL Formula and its Manufacturing

Processes and knowledge to the exclusion of Living Essentials, and without such relief, Living

Essentials will (1) disclose the CNL Formula; (2) utilize the CNL Formula; (3) utilize a

derivative of the CNL Formula; (4) disclose the Genesis Printout; (5) utilize the Genesis

Printout; (6) utilize a derivative of the Genesis Printout; (7) disclose the Product Specifications;

(8) utilize the Product Specifications; (9) utilize a derivative of the Product Specifications; (10)

disclose the Manufacturing Processes; (11) utilize the Manufacturing Processes; (12)

manufacture or contracting for the manufacture of the Product; or (13) sell the Product.

273.    CNL is likely to succeed on the merits of its claims.  First, Living Essentials

clearly breached the Manufacturing Agreement by purporting to terminate the agreement,

without complying with the termination provisions.  Further, CNL created the CNL Formula

which is a CNL trade secret.  CNL also created the Genesis Printout, the Product Specifications

and the Manufacturing Processes, all of which is a CNL trade secrets.  Living Essentials

misappropriated the CNL Formula, the Genesis Printout, the Product Specifications and the

Manufacturing Processes and is now using the CNL Formula, or a derivative thereof, and the

Manufacturing Processes without CNL's authorization.

274.    Further, CNL has no adequate legal remedy.  In this regard, the CNL Formula, the

Genesis Printout, the Product Specifications and the Manufacturing Processes are CNL's

proprietary trade secrets.  It will be difficult, if not impossible, to measure the damage to CNL as

a result of disclosure of its trade secrets in monetary terms.  Further, if Living Essentials is

allowed to continue to distribute its cash to its members, Living Essentials will not reasonably be capable of responding to CNL's claims by paying a damage award.

## VI.  JURY DEMAND

Counter Plaintiffs demand a trial by jury on all issues so triable.

## VII.  REQUEST FOR RELIEF

Wherefore, considering the premises, CNL respectfully requests that, following trial of this matter, the CNL be awarded the following relief:

1.      Actual compensatory damages;

2.      Treble damages;

3.      Exemplary and statutory damages;

4.      Disgorgement of profits from Living Essentials;

5.      Reasonable royalty payments;

6.      Attorneys' Fees and costs of court;

7.      Pre and post-judgment interest at the highest lawful rate;

8.      Injunctive and declaratory relief as prayed for herein; and

9.      Such other and further relief to which it may be justly entitled at law or in equity.

Respectfully submitted,

**BANOWSKY & LEVINE, P.C.**


/s/ Baxter W. Banowsky
Scott D. Levine
State Bar No. 00784467
Baxter W. Banowsky
State Bar No. 00783593
Kurt C. Banowsky
State Bar No. 00787036

12001 N. Central Expressway
790 Coit Central Tower
Dallas, Texas 75243
Telephone: (214) 871-1300
Facsimile: (214) 871-0038

**ATTORNEYS FOR DEFENDANTS
AND COUNTER-PLAINTIFFS**


## CERTIFICATE OF SERVICE

I certify that the foregoing has been served, via the Court's ECF system, on all counsel of record contemporaneously with it filing.


 /s/ Baxter W. Banowsky
Baxter W. Banowsky